ESTATE OF ORVILLE B. LITTICK, DECEASED, CLAY LITTICK AND ANNE H. LITTICK, COEXECUTORS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 65578.   Filed October 24, 1958.

*John C. Graham, Esq.,* for the petitioner.
*James F. Shea, Esq.,* for the respondent.

TIETJENS, *Judge:* The Commissioner determined a deficiency in estate tax of $25,286.22.

The question for decision is whether 670 shares of common stock in the Zanesville Publishing Company owned by decedent at the time of his death subject to the terms of a certain contract between decedent and other stockholders should be valued for estate tax purposes at $200,000 as reported by the estate or at its fair market value $257,910.57 as determined by the Commissioner.

#### FINDINGS OF FACT.

Part of the facts are stipulated, are so found, and the stipulation and the pertinent exhibits are included herein by this reference.

The petitioners, Clay Littick and Anne H. Littick, are the duly named, appointed, qualified, and acting coexecutors of the Estate of Orville B. Littick, deceased.

Orville B. Littick died on September 2, 1953.

A Federal estate tax return was filed with the district director of internal revenue, Columbus, Ohio, for his estate on January 11, 1954.

The decedent was born on July 2, 1890.   His brother, Arthur Littick, was born February 7, 1892; another brother, Clay Littick, was born August 14, 1893; and the decedent's son, William O. Littick, was born March 16, 1927.

Orville B. Littick suffered for a period of 22 months prior to his death from an incurable cancerous disease known as multiple myeloma sarcoma, which was the cause of his death on September 2, 1953.

During the 22 months preceding his death, decedent was hospitalized at the Bethesda Hospital, Zanesville, Ohio, and the University Hospital, Columbus, Ohio, as follows:

(a) Bethesda Hospital, Zanesville, Ohio, from December 11, 1951, to December 18, 1951.

(b) University Hospital, Columbus, Ohio:

    (1) From December 27, 1951, to January 1, 1952;

    (2) From October 10, 1952, to February 10, 1953; and

    (3) From June 2, 1953, to June 5, 1953.

Decedent's last will and testament was admitted to probate in the Probate Court of Muskingum County, Ohio, and, in part, provided as follows:

*ITEM IX.* I have signed Agreements with my brothers, Clay and Arthur, relative to the disposition of my interest in The Zanesville Publishing Company and Southeastern Ohio Broadcasting System, Inc., Zanesville, Ohio. My estate shall respect the terms and conditions of said Agreements in every detail, and I instruct, direct and empower my Executors and Trustees to comply with the terms of said Agreements in every detail. If in carrying out the terms of said Agreements there is a conflict with any other provision in this Will, said Agreements shall control.

An agreement dated September 16, 1952, was executed by Orville B. Littick, Arthur S. Littick, Clay Littick, William O. Littick, and The Zanesville Publishing Company, which agreement provided, in part, as follows:

### AGREEMENT

THIS AGREEMENT made and entered into this 16th day of Sept., 1952, by and between Orville B. Littick, Zanesville, Ohio; Arthur S. Littick, Hoopeston, Illinois; Clay Littick, Zanesville, Ohio; William O. Littick, Zanesville, Ohio; and The Zanesville Publishing Company, a Corporation, Zanesville, Ohio.

WHEREAS, The Zanesville Publishing Company was founded and established by W. O. Littick, the father or [*sic*] Orville, Arthur, and Clay, and the grandfather of William;

WHEREAS, Orville, Arthur, and Clay are brothers and the sole owners of all the outstanding common shares of The Zanesville Publishing Company;

WHEREAS, Orville, Arthur, and Clay are the holders as of this date of the respective common shares set opposite their names:

Orville_____ Six hundred seventy (670) shares

Arthur_____ Twenty-five (25) shares

Clay_____ Six hundred sixty-five (665) shares

WHEREAS, Arthur is the holder of Ninety-seven Thousand ($96,000.00) [*sic*] Dollars of debentures issued by said Company, which debentures are transferable at his option into six hundred forty (640) shares in accordance with an agreement that he entered into with the Company at the time that the debentures were issued to him and he surrendered six hundred forty (640) shares of common stock in consideration thereof, and it was understood by and between the parties to this agreement that the said Arthur S. Littick would not have converted the common stock into debentures if he had not been given the exclusive right at his option to reconvert at any time he deemed advisable;

WHEREAS, the individuals to this agreement are desirous of having said Company operated by the survivors, or survivor, of the individuals to this agreement;

WHEREAS, Orville B. Littick is the only individual to this agreement who has a son, named William O. Littick, and said William has for some time been associated with the Company;

WHEREAS, it is the opinion of the parties to this agreement that William should be competent to assume full management of the business by the time he reaches the age of thirty-five (35) years;

Now, THEREFORE, it is mutually agreed as follows:

(1) The parties to this agreement shall not individually or collectively, directly or indirectly, do anything at any time during the life of this agreement that shall put his, theirs, or cause the other parties' interest to be divested or converted in any manner whatsoever except in strict conformity with the spirit and intent of this agreement.

(2) If any of the common shares have been converted, during the life of the party to this agreement, into debentures or preferred, the same may be reconverted into common at any time during the life of the party on the same basis as said shares were originally converted.

(3) If at the time of the death of any party to this agreement he is a holder of debentures, said debentures shall forthwith be reconverted into common stock in the same amount of shares which he surrendered at the time he accepted the debentures.

(4) It is agreed that at this time the fair value for each shareholder's entire holdings is Two Hundred Thousand ($200;000.00) Dollars.

\* \* \* \* \* \* \*

(b) Within sixty days after each annual report of the Company is delivered to the shareholders, the shareholders shall meet and discuss the value of the shares outstanding, and a new value may be placed upon said shares for the purpose of this agreement, providing it is agreed to by a majority of the following four individuals: Orville, Arthur, Clay, and William; or any two, if one or more be deceased.

(c) The new valuations fixed, in accordance with (b) above, shall be substituted for the $200,000, or the last substituted valuation.

(d) The last valuation may not be decreased without the unanimous consent of all living parties.

(e) The seventy (70) shares held by William shall not be considered as outstanding in fixing new valuation under this paragraph.

(f) The seventy (70) shares held by William shall be placed in escrow with the Citizens National Bank of Zanesville, Ohio and held by said bank until all other outstanding shares held by Orville, Arthur and Clay have been retired, or upon the written approval of the living parties to this agreement.

(g) If William at the time of his death is the holder of the seventy (70) shares and dies prior to the death of Arthur or Clay, or if William leaves the employment of the company for any reason, the seventy (70) shares shall be returned to the company and cancelled without the payment of consideration to William's estate. William shall hold the seventy (70) shares subject to all the provisions of this agreement and the agreement executed simultaneously with this agreement between the Publishing Company, the Litticks, and the Grahams, and commonly known as the "T. V. Contract."

\* \* \* \* \* \* \*

(5) Upon the death of Orville, Arthur, or Clay, the decedent's estate, within ninety (90) days after the appointment of an administrator or executor of said estate and after said estate shall have surrendered any debentures that the decedent dies seized of and the common shares of stock issued in lieu thereof as provided in Paragraph (3) above, the Company shall purchase said entire holdings by issuing Two Hundred Thousand ($200,000) Dollars of the eight (8%) per cent debentures. If the decedent does not own at the time of death six hundred sixty-five (665) shares, or the equivalent thereof, said $200,000 shall be decreased proportionately.

(a) In order that William, upon his father's death, may have some interest in the Company, Orville's estate shall deliver six hundred (600) shares to the Company and his estate shall receive the full $200,000 8% debentures, and William shall receive seventy (70) shares. The seventy shares shall be held in escrow as provided in Paragraph (15).

(6) Said debentures shall be twenty-year (20), eight (8%) per cent, debentures, callable after fifteen (15) years from date of issue on any interest paying date; interest payable June 30 and December 31 each year.

(a) The decedent's estate shall have the right to deliver to said Company debentures in an amount not to exceed Fifty Thousand ($50,000) Dollars within one (1) year from decedent's death, and, thereupon, said Company shall retire said debentures.

(b) Each decedent's estate shall be considered as a unit and shall have the right to require the redemption of debentures in any one year in an amount not in excess of Ten Thousand ($10,000.00) Dollars. (This provision shall not become operative until after the first year.)

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(10) Arthur agrees to surrender his stock and debentures upon the same terms and conditions as provided in Paragraphs (5) and (6) above;

(a) If, at the time of the death of the survivor of Orville and Clay, William is thirty-five (35) years of age; or

(b) Upon William's arriving at age of thirty-five (35), if Clay and Orville are deceased; or

(c) Five (5) years after the death of the survivor of Orville and Clay. And, thereupon, all Directors except Arthur and William shall tender their resignations, and, upon failure to do so, they shall be subject to removal by the shareholders without cause, notwithstanding any other provision in this agreement. From the date that this paragraph becomes operative until the transfers under Paragraphs (5) and (6) are completed, Arthur shall not vote his stock.

(d) If Arthur has surrendered his stock to debentures prior to William's death, and William precedes Arthur in death, Arthur shall have the right to reconvert his debentures to stock upon the same basis as the original conversion. Said rights shall be exercised within ninety (90) days from William's death.

(11) Simultaneously with the execution of this agreement, all outstanding shares and debentures as of this date shall be placed in escrow with the Citizens National Bank of Zanesville, Ohio, to be held by said bank subject to the terms and conditions of this agreement.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(14) After the death of one of the parties, the Company shall not create a total indebtedness greater than fifty (50%) per cent of the equity of the common shareholders at the time the debt is created, except with the written consent of the holders of the debentures. The Company shall not mortgage, pledge or encumber any of its assets in any manner whatsoever, or at any time, without the written consent of the holders of the debentures.

(15) In the event Paragraph (14) is violated, any holder of the debentures shall have the right to demand redemption within thirty (30) days after knowledge of said violation, and upon failure of the Company to redeem the debentures within thirty (30) days after written notice served upon the Company, the holders of the debentures shall have the right to take over full management of the Company with full power to sell at private or public sale and to dissolve the Company.

(a) In order to protect the debenture holders, William shall leave his seventy (70) shares in escrow with the Citizens National Bank, Zanesville, Ohio, and if the debenture holders elect to take over the Company in order to protect their rights, they shall have the immediate right to vote the seventy (70) shares, elect a new Board of Directors and officers.

(b) When all debentures are paid, or upon the written consent of the debenture and share holders, the Citizens National Bank shall deliver said seventy (70) shares to William.

\*     \*     \*     \*     \*     \*     \*

IN WITNESS WHEREOF, the parties hereto have set their hands the day and date aforesaid.

THE ZANESVILLE PUBLISHING COMPANY

(signed) By Orville B. Littick, *President.*

ATTEST:
(signed) Clay Littick
    *Secretary.*

                                   (signed) Orville B. Littick
                                        ORVILLE B. LITTICK.
                                  (signed) Arthur S. Littick
                                        ARTHUR S. LITTICK
                                  (signed) Clay Littick

WITNESS:                             CLAY LITTICK
(signed) Ernest B. Graham        (signed) William O. Littick
(signed) John C. Graham               WILLIAM O. LITTICK

This agreement has been duly carried out.

It is stipulated that—

At all times material to this case the 670 shares of stock of The Zanesville Publishing Company, owned by the decedent at his death, had a fair market value of $257,910.57; without regard to the agreement dated September 16, 1952, signed by decedent, his two brothers, his son and the Publishing Company. The value of $257,910.57 is to be used for estate tax purposes, unless the Court determines that the agreement, dated September 16, 1952, operated to restrict the value of the 670 shares for federal estate tax purposes.

The 670 shares of Zanesville Publishing Company stock were included in the estate tax return at a value of $200,000. The Commissioner in determining the deficiency herein determined the value of the shares to be $257,910.97.

OPINION.

The Commissioner recognizes that "restrictive agreements have been held effective for estate tax purposes where the agreement restricts transfers during life as well as transfers upon death," citing *Brodrick* v. *Gore*, 224 F. 2d 892 (C. A. 10, 1955); *May* v. *McGowan*, 194 F. 2d 396 (C. A. 2, 1952); *Commissioner* v. *Bensel*, 100 F. 2d 639 (C. A. 3, 1938), affirming 36 B. T. A. 246; *Lomb* v. *Sugden*, 82 F. 2d 166 (C. A. 2, 1936); *Wilson* v. *Bowers*, 57 F. 2d 682 (C. A. 2, 1932); *Estate of Albert L. Salt*, 17 T. C. 92 (1951); *Estate of Lionel Weil*, 22 T. C. 1267 (1954).

Here, however, he argues that because of the factual situation the agreement set forth in the fact findings was part of an overall testamentary plan, affected by the impending demise of the decedent; that the agreement was not at arm's length, as demonstrated by the character of the malady from which decedent was suffering and the less than fair market value of the stock as agreed upon by the parties. Further, that because of the other factors embodied in the agreement of September 16, 1952, and decedent's will, the fair market value of the stock is the proper measure of value, rather than the agreed-on $200,000, and this because the transaction was embraced in one of three categories described in section 811, I. R. C. 1939, as—

1. Transfers made in contemplation of death.

2 Transfers made with the intention of taking effect in possession or enjoyment at or after the death of the decedent.

3. Transfers made where the decedent retained for his life or other designated period the possession or enjoyment of, or the right to income from the property transferred.

We think the Commissioner's argument is not well taken. We note here that while it is now stipulated that the fair market value of the 670 shares was "at all times material to this case," $257,910.57 rather than $200,000, there is nothing in the record to indicate that the $200,000 figure was not fairly arrived at by arm's-length negotiation or that any tax avoidance scheme was involved.

Further, we do not believe any "transfer" within the meaning of section 811 is here involved. The decedent prior to his death entered into an agreement with other stockholders which bound his stock to be sold to the Publishing Company upon his death at a price certain. The agreement is not unambiguous and if taken paragraph by paragraph, we might interpret it as a sale of 600 shares to the corporation at an agreed price of $200,000, with the remaining 70 shares to be held in escrow for the son, William. (The $200,000 price would then be applicable only to the 600 shares.) Nevertheless, we think that if the entire transaction is considered, a proper construction of the agreement is that the estate was bound to sell and the corporation agreed to buy Orville's entire interest in the business, consisting of 670 shares, for $200,000. After that was done, 70 of the shares were to be held in escrow for the son in order that "he may have some interest" in the company. If the son at any time left the employ of the company these 70 shares were to be canceled by the company without payment of consideration to him. So interpreting the agreement, we have no occasion for valuing separately the shares in which William was to have an interest and the other 600 shares. The $200,000 figure was intended by the parties to the agreement to relate to Orville's "entire holdings" in the company. And so interpreted, there can be no doubt under the cited cases but that the agreement

to which the stock was subject, determined the value of the stock. Despite the fact that decedent was ill, with what eventuated as a mortal illness, when the agreement was made, we do not think this fact vitiated the agreement or made it anything other than what it was intended by the parties to be. Under the facts—and despite decedent's illness at the time—it certainly was possible that one or the other of his brothers could still have predeceased him. The agreement, for all that appears, was a binding pact on all parties. The cases cited, while not involving precisely similar circumstances, enunciate principles which are here controlling. Where for the purpose of keeping control of a business in its present management, the owners set up in an arm's-length agreement, which we consider this to be, the price at which the interest of a part owner is to be disposed of by his estate to the other owners, that price controls for estate tax purposes, regardless of the market value of the interest to be disposed of.

These principles were followed in *Brodrick* v. *Gore, supra*. There, the deceased and his two sons had been partners in a business since 1933. They had an agreement among themselves that upon the death of one of the partners the interest of the deceased partner was to be purchased by the survivors for a sum equal to its book value at the time of death. By will, the decedent bequeathed his partnership interest to his sons who were also residuary legatees under the will and were named as executors. In probate proceedings the book value of the partnership interest of the deceased was determined to be $345,-897.53, the interest was conveyed to the sons for that amount, and also was included in the Federal estate tax return at that figure. The Commissioner determined the fair market value of decedent's interest to be $516,457.84 and used this value in determining the estate tax.

The Court of Appeals held that the partnership interest was properly includible in the estate at its book value. The Commissioner in his pleadings and argument advanced contentions very similar to the issues he raises here. In disposing of these contentions the court said—

[10] Relying upon Section 811 of the Internal Revenue Code, supra, as warrant for the imposition of the deficiency in estate tax, the Director in his answer pleaded as an affirmative defense that the partnership agreement, as amended, constituted a transfer by the decedent of an interest in property other than by bona fide sale for an adequate and full consideration in money or money's worth which was includable in his gross estate as a transfer in contemplation of death or under which the decedent reserved for his life or for a period not in fact ending before his death the right to the income from the property transferred; and he pleaded as a further affirmative defense that to the extent that the decedent by the agreement transferred an interest in the property for less than the fair market value thereof at the time of the death of the decedent, such transfer was a revocable transfer. It is argued that these defenses raised genuine issues of material fact and therefore it was error to

enter summary judgment for the executors. But the decedent did not by the execution of the agreement make any transfer of property in contemplation of death, revocable, or otherwise, within the intent and meaning of the statute. He entered into a partnership agreement with his sons providing for the operation and conduct of a partnership business. The agreement was by its clear terms enforceable in favor of and against the estate of the first copartner to die and the two surviving copartners, whether the first to die was the decedent or one of the sons. It was specifically enforceable regardless of which copartner should die first. It was not known whether the decedent would outlive one or both of the sons. And it was supported by an adequate and full consideration, within the intent and meaning of the statute. The affirmative defenses pleaded did not present genuine issues of material fact. They presented issues of law which were not well founded.

We recognize that here it was likely that Orville would die before his brothers, but that was not a foregone conclusion and it is not such fact as should destroy the validity of his agreement with his brothers. Had either brother predeceased him we think the agreement to purchase the stock at the $200,000 figure would clearly have been enforcible. We think the principles followed in the *Gore* case are applicable here and hold for the petitioner.

Because of other agreed-upon adjustments,

*Decision will be entered under Rule 50.*