ESTATE OF MINNIE CAPLAN, DECEASED, ARTHUR CAPLAN, ET AL., Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Caplan v. Commissioner
Docket No. 1191-71
United States Tax Court
T.C. Memo 1974-39; 1974 Tax Ct. Memo LEXIS 280; 33 T.C.M. (CCH) 189; T.C.M. (RIA) 74039; February 12, 1974, Filed. Myron A. Weiss, for the petitioners. *281 Allan D. Hill, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION
HALL, Judge: Respondent determined a deficiency of $62,667.97 in the estate tax of the Estate of Minnie Caplan. The issues presented are (1) whether certain stock transfers made by decedent to her sons were in contemplation of death and therefore includible in her gross estate pursuant to section 2035, [1] and (2) whether the sale of certain shares of stock by decedent to her sons was for an adequate and full consideration in money or money's worth.
FINDINGS OF FACT
Some of the facts have been stipulated and are found 2 accordingly.
Decedent Minnie Caplan, a resident of Los Angeles County, California, died testate on October 21, 1966, at the age of 63 years. Her Federal estate tax return was filed with the district director of internal revenue at Los Angeles.
Arthur Caplan and Morton Caplan (hereinafter Arthur and Morton), decedent's surviving sons (and sole legatees under decedent's will), were duly appointed as co-executors of the estate. Arthur and Morton resided *282 in Los Angeles County at the time the petition herein was filed.
In September 1961, decedent, Arthur and Morton owned three California corporations which were engaged in the retail grocery business: Carl's Ranch Markets, Inc. operated a chain of retail supermarkets; Caplan Enterprises, Inc. owned the liquor departments in the retail supermarkets operated by Carl's Ranch Markets; and Harry Caplan, Inc. performed the administrative work of the other two corporations.
On September 20, 1961, the issued and outstanding stock in those corporations was owned as follows: Carl's Ranch Markets, Inc.
Caplan Enterprises, Inc.
Harry Caplan, Inc. Arthur
10 shares
60 shares
112.5 shares
Morton
10 shares
60 shares
112.5 shares
Decedent
10 shares
60 shares
75 shares
Harry Caplan, Inc.
-0-
20 shares
-0-
Total
30 shares
200 shares
300 shares 3 Decedent had acquired part of her interest in these shares by inheritance from her husband, Harry Caplan, who died in 1957.
On September 20, 1961, decedent, Arthur and Morton entered into a Buy-Sell Agreement (hereinafter Agreement) which provided that upon the death of one of them, the survivor or survivors *283 would purchase the decedent's stock in all three corporations at its then book value, which the Agreement provided was $2,822.50 per share for Carl's Ranch Markets, $120 per share for Caplan Enterprises, and $96.50 per share for Harry Caplan, Inc. The stated purpose of the Agreement was to insure continuity of management of the corporations after the death of any shareholder, and to set forth the terms upon which the shares of the deceased shareholder would be sold to the survivors. The Agreement made no mention of lifetime transfers. By this Agreement the parties intended to establish the fair market value of the shares for estate tax purposes.
On May 25, 1964, decedent Minnie Caplan made identical gifts of one-fourth of one share of stock in Carl's Ranch Markets to each of her sons. The transfers were made to reduce estate tax liability.
On July 3, 1964, decedent first became aware she had a lump in her left breast. On September 12, 1964, decedent was examined by a surgeon who determined that she had a 4 breast tumor that required immediate surgery. On September 15, 1964, decedent underwent a left radical mastectomy. Postoperative microscopic diagnosis disclosed the presence *284 of malignant cells in the auxiliary lymph nodes under decedent's left arm, and cobalt therapy was performed.
On May 31, 1965, decedent made identical gifts of one and one-half shares of stock in Carl's Ranch Markets to each of her sons. The transfers were made to reduce estate tax liability.
On September 1, 1965, a chest x-ray of decedent revealed that the tumor had spread and she was again placed on cobalt therapy.
On April 11, 1966, decedent was removed from her home in a coma to Cedars of Lebanon Hospital. During her four day hospital stay, cancer was found throughout her lungs and suspected in her brain. Decedent was bedridden from April 1966 until her death from cancer on October 21, 1966.
On August 3, 1966, decedent sold all her remaining stockholdings in all three corporations to her sons at the book value per share stated in the Agreement. She received 20 percent of the sales price in cash and Arthur's and Morton's promissory notes for the balance.No monies, other than the 20 percent cash down payments, were ever paid by Arthur and Morton either to decedent or her estate. The promissory notes were distributed to Arthur and Morton as beneficiaries of the 5 estate *285 and were eventually cancelled.
The following is a schedule showing all transfers involved in this litigation: Date
To Arthur
To Morton May 25, 1964
1/4 share Carl's Ranch Markets
1/4 share Carl's Ranch Markets
May 31, 1965
1-1/2 shares Carl's Ranch Markets
1-1/2 shares Carl's Ranch Markets
Aug. 3, 1966
3-1/4 shares Carl's Ranch Markets
3-1/4 shares Carl's Ranch Markets
30 shares Caplan Enterprises, Inc.
30 shares Caplan Enterprises, Inc.
37-1/2 shares Harry Caplan, Inc.
37-1/2 shares Harry Caplan, Inc.
On October 21, 1966, the date of decedent's death, the fair market values per share of stock of Carl's Ranch Markets, Caplan Enterprises and Harry Caplan, Inc. were $14,566.30, $225 and $411.16, respectively.
On Schedule G of the Estate Tax Return prepared by decedent's accountant and filed by petitioners on behalf of the estate, the transfers of stock of Carl's Ranch Markets made on May 25, 1964 and May 31, 1965 were included in decedent's gross estate at their book value as gifts made in contemplation of death. The transfers made on August 3, 1966 were not included in the gross estate. In the statutory notice of deficiency respondent determined *286 that the transfers of May 25, 1964 and May 31, 1965 should have been included in decedent's 6 gross estate at their fair market values as of the date of decedent's death instead of at book value, and determined that the transfers of August 3, 1966 were made in contemplation of death and should have been reported to the extent that the fair market value of the shares exceeded the sales price.
The excess of the fair market value of the stock transferred by decedent to her sons over the consideration paid therefor was $157,213. The value of decedent's gross estate not including such stock was $167,307.
Decedent's predominant motive in making the stock transfers in issue was to reduce the size of her estate to avoid future estate tax liability. All the transfers in issue were made by decedent in contemplation of death.
OPINION
1. Contemplation of death issue. Respondent contends that the transfers made by decedent on May 25, 1964, May 31, 1965 and August 3, 1966 of shares of three family corporations to her sons Arthur and Morton were transfers made in contemplation of death within the meaning of section 2035.[2] Petitioners contend that the transfers 7 were life motivated. *287 The resolution of this issue is essentially a factual determination. Allen v. Trust Co., 326 U.S. 630 (1946). [2]
*288 "[A] transfer is made in contemplation of death if the thought of death is the "impelling cause of the transfer." City Bank Farmers Trust Co. v. McGowan, 323 U.S. 594, 599. The transfer may be so motivated, even though the decedent had no idea that he was about to die." Allen v. Trust Co., supra, at 635.
Objective factors must be evaluated in determining the subjective intent of the decedent for making inter vivos transfers. Estate of Oliver Johnson, 10 T.C. 680 (1948). After reviewing the facts in this case, we conclude that all 8 the transfers in issue were made in contemplation of death for the following reasons:
While decedent was only 63 on her death, she had been in poor health for the last two years of her life, beginning with a radical mastectomy operation on September 15, 1964, and ending with her death on October 21, 1966. All but the first gifts (made on May 25, 1964) succeeded her cancer operation. Although she was apparently in good *289 health at the time she made the first gifts, these gifts were acknowledged on the estate tax return as having been made in contemplation of death, as were the May 31, 1965 gifts. The interval between the last transfers (which were by far the largest transfers) on August 3, 1966, and decedent's death was only two and a half months, and decedent was bedridden when she made them. The interval between the first (and smallest) transfers and decedent's death was two and a half years. Petitioners Arthur and Morton testified that their mother remained apparently cheerful and optimistic to the end, including the period when she was bedridden with cancer. Nonetheless, prior to her death she transferred nearly half her total assets to her sons, the natural objects of her bounty.
We also note that decedent's husband had died in 1957, and part of the shares she transferred had been received from him. Having been through one probate and estate tax on the occasion of her husband's death, decedent and her sons must 9 have been well aware of the difficulty of establishing the fair market value of closely held stock, and the high cost of estate taxes. In 1961, decedent and her sons entered *290 into a Buy-Sell Agreement which was intended to establish the then book value of the shares in the three family corporations as their fair market value for estate tax purposes, although the fair market value of such shares, viewed apart from the Agreement, was substantially higher. The existence of a lively awareness of, and desire to reduce, the impact of estate taxes is readily inferable from the execution of such an agreement.
Probably the heart of this issue lies in whether decedent's predominant motive in making the transfers was to avoid estate taxes by means of making inter vivos gifts, as respondent contends, or to effect a gradual withdrawal from the family business and transfer ownership to her sons, as petitioners maintain. After considering carefully all the surrounding circumstances, and the testimony of Arthur and Morton, and observing their demeanor on the witness stand, we conclude that decedent's predominant motive in making all the transfers in question was to reduce her taxable estate, and that the gifts were made in contemplation of death. Estate of Mary Lois K. McIntosh, 25 T.C. 794 (1956), affirmed 248 F.2d 181 (C.A. 2, 1957). *291 2. Adequate and full consideration issue. Petitioners contend that the Agreement dated September 20, 10 1961, is effective to limit the value on August 3, 1966 and at death for estate tax purposes of the shares transferred by decedent to her sons on August 3, 1966. Respondent disagrees because the Agreement did not restrict inter vivos transfers. We agree with respondent.
On September 20, 1961, decedent and her sons entered into an Agreement which provided that "upon the death or (sic) any of the parties hereto, the survivor or survivors shall purchase in equal amounts, and the estate of decedent shall transfer, sell and deliver all of the capital stock of [the three family] corporations now owned or which may hereafter be owned by the party hereto who is the first to become deceased" at the book value as of the date of the Agreement. There is nothing in the Agreement preventing lifetime transfers. In fact, decedent transferred all of her shares during her lifetime either by gift or by sale. The last transfer was made on August 3, 1966. On that date decedent transferred her remaining shares in the three family corporations to her sons in exchange for the book value *292 of these shares as of the date of the Agreement.
Where, as here, an individual holds an option to purchase decedent's stock exercisable at her death, but decedent can dispose of the stock during her lifetime, little weight will be given to the option price in determining the value of the stock for estate tax purposes. Claire Giannini Hoffman, 2 T.C. 11 1160, 1178-1180 (1943), affirmed without discussion of point, 148 F.2d 285 (C.A. 9, 1945), cert. denied 326 U.S. 730 (1945); Section 20.2031-2(h), Estate Tax Regs.; Rev Rul. 59-60, 1959-1 C.B. 237, 243-244. A restrictive agreement to be effective for estate tax valuation purposes must restrict transfers during life as well as transfers upon death. Brodrick v. Gore, 224 F.2d 892 (C.A. 10, 1955); Estate of Orville B. Littick, 31 T.C. 181 (1958); Estate of Lionel Weil, 22 T.C. 1267 (1954).
Because the Agreement had no effect on transfers of stock by decedent during her lifetime, the stock purchase price stated in the Agreement is not determinative of the *293 fair market value of the stock either at the time of the sale or at decedent's death.The consideration paid for the stock transferred on August 3, 1966, was neither adequate nor full. The shares transferred on August 3, 1966, are includible in decedent's estate at their fair market value at date of death less the consideration paid therefor on August 3, 1966, in the form of cash and promissory notes. Section 2043.
Decision will be entered
under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the year in issue.↩
2. SEC. 2035. TRANSACTIONS IN CONTEMPLATION OF DEATH.
(a) General Rule. - The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, in contemplation of his death.
(b) Application of General Rule. - If the decedent within a period of 3 years ending with the date of his death (except in case of a bona fide sale for an adequate and full consideration in money or money's worth) transferred an interest in property, relinquished a power, or exercised or released a general power of appointment, such transfer, relinquishment, exercise, or release shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this section and sections 2038 and 2041↩ (relating to revocable transfers and powers of appointment); but no such transfer, relinquishment, exercise, or release made before such 3-year period shall be treated as having been made in contemplation of death.