ESTATE OF EVELYN LANDSDALE WILDMAN, DECEASED, WELLS FARGO BANK, N.A., FORMERLY KNOWN AS CROCKER NATIONAL BANK, EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Wildman v. Commissioner
Docket No. 1400-87
United States Tax Court
T.C. Memo 1989-667; 1989 Tax Ct. Memo LEXIS 667; 58 T.C.M. (CCH) 1006; T.C.M. (RIA) 89667; December 21, 1989; As corrected December 21, 1989 Clarence J. Ferrari, Jr. and Charles H. Sabes, for the petitioner. Elizabeth L. Groenewegen, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent determined a $ 215,312.34 deficiency in Federal estate tax. The parties have settled all issues but one concerning the value of decedent's one-fifth interest in certain real property. More specifically, the remaining controversy concerns the discounts, if any, attributable to minority ownership and transfer restrictions on decedent's interest in the realty. FINDINGS OF FACT The parties entered into a stipulation of facts, along with attached exhibits, all of which are incorporated by this reference. Evelyn Landsdale Wildman *668 (decedent) died August 8, 1982, and Wells Fargo Bank, N.A., formerly known as Crocker National Bank (bank), was appointed and has acted as executor of decedent's estate. On December 30, 1943, decedent's parents created separate trusts (1943 trusts) for the benefit of decedent and Clare Johnston, decedent's sister. On October 31, 1959, decedent's parents created separate trusts (1959 trusts) for decedent's three children, Tonya, Lynne, and Peter. Also on October 31, 1959, decedent's parents created separate trusts for decedent's sister's four children, Cynthia, Philip, Terry, and Andrew. Bank has, at all relevant times, been sole trustee of each of the above-referenced trusts. In all, there were nine trusts, two for children and seven for grandchildren of decedent's parents. Each of the children or grandchildren was a lifetime beneficiary. Decedent's parents owned in excess of 2,000 acres of unirrigated Merced County rural land. It was located on the western edge of the San Joaquin Valley in central California and had been named the Quinto Ranch (Quinto). Decedent's parents, sometime during December 1943, placed undivided minority interests in Quinto into their children's *669 trusts. As of the end of 1959, each of the nine trusts held undivided interests in Quinto, as tenants in common. Decedent's parents transferred to decedent's 1943 trust, along with another asset, an undivided one-half interest in approximately 219.966 acres of Quinto. Under the trust terms, decedent was entitled to a life interest in the entire net income of her 1943 trust, and upon decedent's death the income was payable to decedent's children in equal shares. After the death of the last of decedent's children, the trust was to be terminated and the corpus distributed, per stirpes, to decedent's surviving issue. If decedent had no issue upon the death of her last child, then the property was to go to decedent's sister, Clare, or Clare's issue. If Clare was deceased without children or other issue, then the property was to go to decedent's heirs at law. Decedent's parents transferred to their grandchildren's 1959 trusts undivided interests so that the nine trusts (two children and seven grandchildren) held 100 percent of 2,312 acres of Quinto, as undivided tenants in common. Under the 1959 trusts, the grandchildren were to be life interest, net income beneficiaries with devolution *670 of the corpus under the same terms as the 1943 trust, except beginning one level down from decedent. Certain language in the trust expresses the trustors' intention that the Quinto realty was to be held as a single unit and not sold without first consulting decedent. The trustee was not bound by the following language (which was preceded by a clause making it precatory) in the 1943 trust: "it is * * * the hope of the Trustors that said property shall be so retained for a substantial period of years and shall not be sold without first consulting [decedent] * * *." Prior to 1960, Quinto was used solely for grazing and "dry farming" and had no water for irrigation. In 1960, the Bureau of Reclamation of the United States Department of the Interior granted temporary water rights under the Reclamation Act. Bank, as trustee of all nine trusts, attempted to obtain permanent water rights. On June 8, 1967, bank was advised by the Bureau of Reclamation that, as trustee, it would be treated as a single owner of Quinto and that the nine trusts would be limited to a single unit or 160 acres of eligible land in each contracting water district. Bank was also advised that if title to Quinto *671 was placed in undivided 160-acre or larger parcels in each water contracting district and transferred to individual beneficiaries of the nine trusts, then each such owner would qualify for water for irrigation purposes and collectively they would be entitled to 10 times more water. The trustors, trustee, and life beneficiaries of all nine trusts agreed that it was to their respective best interest for 1,212.4 acres of Quinto to be sold outright by the trusts to the nine life beneficiaries in order to secure the additional water rights. On July 30, 1969, the trustors, trustee, and nine life beneficiaries entered into a No-Recourse Purchase Agreement (agreement), subject to court approval, to sell the 1,212.4 acres of Quinto to the nine life beneficiaries. The property selected for the 1,212.4-acre sale was composed of noncontiguous portions of larger orchards. The agreement was not recorded in the Merced County real estate records. Deeds and a mortgage securing the purchase of the 1,212.4 acres by the beneficiaries were recorded in the Merced County real estate records. The deeds to the beneficiaries did not reference the agreement. The agreement authorized the continued use *672 of Quinto as irrigated farmland and that it be operated as a unit. To this end, none of the beneficiaries were to have the right to sell or transfer their undivided interest without first offering it to the remaining life beneficiaries as a group at the then appraised fair market value as dry farmland. If the remaining beneficiaries declined, the interest must then have been offered to the trustee at the same price as the one established for remaining beneficiaries before the undivided interest could be sold outside this group. Paragraph 7 of the agreement contains the following language: 7. It is in the best interest of said Trust Beneficiaries and of said trusts that all said irrigated farmland be operated as a unit and accordingly none of said beneficiaries shall have the right to sell or transfer his or her undivided interest or any part thereof in any or all of said lands. In the event any of said Trust Beneficiaries or their executors or estates nevertheless determine to sell or dispose of any of said lands, the same shall first be offered for sale to the surviving beneficiaries as a group at the then appraised fair market value as dry farmland, and in the event said Trust *673 Beneficiaries conclude not to accept such offer, said interests in said lands shall thereupon be offered for sale to Trustee at the same appraised market value as dry farmland. The life beneficiaries granted decedent's father and brother-in-law the exclusive right to negotiate a lease on Quinto. On March 17, 1970, the San Mateo County Superior Court entered judgment in favor of the trustors and nine life beneficiaries' complaint for declaratory relief against the trustee to permit the transfer of a portion of Quinto to the life beneficiaries. The agreement set a purchase price based upon the appraised value of the "dry farming" use of Quinto. The purchase price for the 1,212.4 acres of Quinto was $ 184,500, which was the dry farming land value. Decedent's share of the purchase price was $ 36,900. Through her participation in the agreement, decedent acquired, by deed, an undivided 20-percent interest in 1,212.4 noncontiguous acres of Quinto, which interest she held until her death on August 8, 1982. Decedent's 20-percent interest in the 1,212.4 acres did not include ownership of any portion of the irrigation equipment or related easements and rights of way. Following the *674 transfer, as before, the trustee managed the 1,212.4 acres, along with the remainder of Quinto. The 1,212.4 acres was leased to a corporation, along with the remaining Quinto land for farming purposes. William R. Gray (Gray) was appointed California Inheritance Tax Referee of decedent's estate and his inventory and appraisement indicated that decedent's 20-percent undivided interest in Quinto had a value of $ 386,400 as of August 8, 1982. Bank, as executor, timely filed a Federal estate tax return (Form 706) and reported the value of the 20-percent undivided interest at $ 483,000, less a 20-percent minority interest discount or $ 386,400. Bank, as executor, did not engage the services of an expert real estate appraiser in connection with reporting the value of decedent's 20-percent undivided interest of Quinto as of her date of death. When Gray listed $ 386,400 as the value of decedent's 20-percent interest, he was unaware of the restrictions upon decedent in the agreement. Gray was first advised of the restrictions in a telephone conversation with bank employees on January 17, 1984, which was followed up by a January 23, 1984, letter from bank to Gray. Decedent's sister predeceased *675 decedent during May 1978. The sister's 20-percent interest in the 1,212.4 acres passed to her husband, who was not a party to the agreement. The trustee and the other beneficiaries, although aware of the transfer of the 20-percent interest to the sister's husband, did not attempt to exercise their right of first refusal to the property. In the spring of 1984, bank, as trustee of the nine trusts, engaged Dave Dunshee, M.A.I. (Dunshee), to appraise the Quinto ranch as a whole, the portion held by the nine trusts, and the 1,212.4 acres held by the life beneficiaries. The purpose for the appraisal had no direct relationship to decedent's estate, but was sought by the trustee for purposes of considering the potential for sale of Quinto. Dunshee, as of May 18, 1984, valued the 1,212.4 acres at $ 617,000, [1] the entire Quinto ranch at $ 5,130,000 and the 2,312 acres originally placed into the nine trusts at $ 2,050,000. Due to Dunshee's appraisal, one of decedent's daughters, through her attorney, asserted, by means of a letter mailed September 20, 1984, that the value of decedent's 20-percent undivided interest in Quinto at date of death was $ 117,700 and requested bank to reconsider *676 its position regarding the estate tax reported value. By a letter, dated September 24, 1984, respondent informed bank that the Form 706 filed for decedent's estate was to be examined. The examination was conducted over a 2-year period and culminated in the issuance of a notice of deficiency mailed by respondent on October 30, 1986, wherein respondent determined that decedent's 20-percent undivided interest in the 1,212.4 acres had a $ 525,612 value as of decedent's date of death. The notice of deficiency contained other determinations which the parties have resolved by agreement. Petitioner offered Dave Dunshee [2] as an expert on the valuation of the subject real estate and respondent agreed that Dunshee was qualified to testify. Dunshee's valuation testimony was offered in the form of an appraisal report under Rule 143(f). Rule references are to this Court's Rules of Practice and Procedure and section references are to the Internal *677 Revenue Code of 1954, as amended and in effect on August 8, 1982, the date of decedent's death. Dunshee valued the 20-percent interest in 1,212.4 acres of Quinto, both as dry and irrigated farmland, at $ 137,518 and $ 665,994, respectively. After applying a 25-percent discount (for minority interest) to dry and a 35-percent discount (for minority interest and lack of ownership of irrigation facilities and noncontiguous nature of the acreage) to irrigated farmland, Dunshee arrived at dry and irrigated values of $ 100,000 and $ 430,000, respectively. Respondent offered no expert testimony and essentially agrees with Dunshee's appraisal with two major exceptions: (1) The land should be valued on the basis of irrigated farm property; and (2) there should be no discount for the minority interest or restrictions on use or sale. *678 Dunshee opined that the 25-percent discount on the dry farmland value was attributable to the minority interest which had several marketplace disadvantages, including inability to use the undivided interest as security for a loan. Dunshee used 35 percent on the irrigated farmland to further discount for the lack of ownership of the irrigation facilities and the noncontiguous nature of the 1,212.4 acres of land. OPINION The parties basically disagree about whether the value of the 20 percent interest in the 1,212.4 acres of farmland should be discounted because it is a minority interest and/or due to restrictions on transfer. Petitioner argues that the land should be valued as dry farmland due to the restrictions contained in the July 30, 1969, agreement. Petitioner further argues that the "dry farm value" should be discounted to account for the minority interest of decedent. Respondent counters that the restriction should have little, if any, effect on value and that the realty should be valued as irrigated farmland which was its status at the time of decedent's death. Respondent also counters that a minority interest in realty does not per se warrant a discount and that *679 petitioner has not shown that a discount would be appropriate in this case. Respondent did not offer an expert and accepts petitioner's expert's report to the extent that it provides undiscounted value of the interest as irrigated farmland. Property includable in a decedent's gross estate is generally included at its fair market value on the date of the decedent's death. Sec. 2031(a); sec. 20.2031-1(b), Estate Tax Regs. Fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Sec. 20.2031-1(b), Estate Tax Regs.; United States v. Cartwright, 411 U.S. 546, 551 (1973); Estate of Hall v. Commissioner, 92 T.C. 312 (1989); Estate of Heckscher v. Commissioner, 63 T.C. 485, 490 (1975). The willing seller and buyer are hypothetical rather than specific individuals or entities. Estate of Bright v. United States, 658 F.2d 999, 1005-1006 (5th Cir. 1981). The determination of value is to be made as of the valuation date (in this case as of the date of death) *680 and knowledge of future events that may have affected the value cannot be attributed to the hypothetical buyer or seller. Sec. 20.2031-1(b), Estate Tax Regs. Restriction on Transfer Discount
The valuation of interests in property for Federal estate tax purposes is a question of fact. See Propstra v. United States, 680 F.2d 1248, 1251 (9th Cir. 1982); Ahmanson Foundation v. United States, 674 F.2d 761, 769 (9th Cir. 1981); Penn v. Commissioner, 219 F.2d 18 (9th Cir. 1955), affg. a Memorandum Opinion of this Court. The circumstances here resulted from decedent's parents' inter vivos plan to devolve a part of their farm and its income to their children and grandchildren. It is clear that the parents sought to keep ownership of the farm in their family for as long as possible, and undivided interests in the farm were, over time, placed in nine trusts for the benefit of the children and grandchildren. In order to maintain their rights to water, it became necessary to sell some of the farm held in trust to the beneficiaries. The 1,212.4 acres selected for sale to the beneficiaries was not contiguous and mainly consisted of irrigated *681 farmland. The parents (trustors), beneficiaries (children and grandchildren), and trustee (bank) entered into an agreement to effect the sale of the 1,212.4 acres to the beneficiaries. The sale price was established on the basis of dry farmland value, even though the farm at that time was irrigated. Paragraph seven of the agreement dated July 30, 1969, contains the following language: It is in the best interest of said Trust Beneficiaries and of said trusts that all said irrigated farmland be operated as a unit and accordingly none of said beneficiaries shall have the right to sell or transfer his or her undivided interest or any part thereof in any or all of said lands. In the event any of said Trust Beneficiaries or their executors or estates nevertheless determine to sell or dispose of any of said lands, the same shall first be offered for sale to the surviving beneficiaries as a group at the then appraised fair market value as dry farmland, and in the event said Trust Beneficiaries conclude not to accept such offer, said interests in said lands shall thereupon be offered for sale to Trustee at the same appraised market value as dry farmland. Petitioner argues that the *682 language of paragraph seven of the agreement requires valuation of decedent's 20-percent interest in the 1,212.4 acres as dry farmland. Almost nine years later, during 1978, decedent's sister died and the sister's 20-percent interest passed to the sister's husband, who was not a party to the July 30, 1969, agreement. Although the other beneficiaries and the trustee were aware of this transfer, they did not require the sister's estate or executor to first offer the 20-percent interest to them at the dry farmland value and no effort was made to compel the sister's husband to agree to the restrictions on transfer, contained in paragraph seven of the agreement. Although some courts have held that a restrictive agreement may fix the value of a closely held business for estate tax purposes, others have held that the restriction merely had some effect on value. In considering whether the restriction fixes value or merely has some effect on value, the following factors should be considered: (1) Whether the price is determinable under the terms of the agreement; (2) whether the owner of the interest is obligated to sell at the contract price and the company or other interest holders are *683 obligated to purchase at that price; (3) whether the obligation to sell at the contract price is binding upon the owner of the interest both during his lifetime, and upon his estate at his death; and (4) whether the agreement is a bona fide business arrangement and not a testamentary device. United States v. Land, 303 F.2d 170 (5th Cir. 1962), cert. denied 371 U.S. 862 (1962); Brodrick v. Gore, 224 F.2d 892 (10th Cir. 1955); Lomb v. Sugden, 82 F.2d 166 (2d Cir. 1936); Wilson v. Bowers, 57 F.2d 682 (2d Cir. 1932); Roth v. United States, 511 F. Supp. 653 (E.D. Mo. 1981); Estate of Fiorito v. Commissioner, 33 T.C. 440 (1959); Estate of Littick v. Commissioner, 31 T.C. 181 (1958); Estate of Weil v. Commissioner, 22 T.C. 1267 (1954). Initially, respondent argues that the cases, in which courts have held that a restriction on transfer had some effect or fixed the value for gift or estate tax purposes, involved partnership interests or interests in closely held corporations. Continuing on this point, respondent notes that we are dealing with *684 an interest in real property. We see this case as no different for purposes of this issue because decedent, her parents, and the other children and grandchildren were operating a family-owned business enterprise (farm) in the form of a joint venture. Decedent's interest was an undivided interest in realty which was part of the joint business venture. We can find no reason for differentiation, in this case, between a restriction on the sale of realty and a restriction on the sale of stock in a corporation which owns the realty. Considering the four factors listed above, we find that the price was determinable in that it was sufficiently defined to be capable of valuation. Additionally, the obligation to offer the realty to the other beneficiaries or the trustee was binding on decedent during her life and upon her estate. A restrictive agreement for the maintenance of family ownership and control may be a legitimate business consideration. Estate of Bischoff v. Commissioner, 69 T.C. 32, 39-40 (1977); Estate of Reynolds v. Commissioner, 55 T.C. 172 (1970); Estate of Littick v. Commissioner, supra; and Baltimore National Bank v. United States, 136 F. Supp. 642 (D. Md. 1955). *685 We find that the restrictive agreement here was not merely a substitute for testamentary disposition and was for a legitimate business consideration. The aspect which we find troubling concerns the likelihood that decedent's interest would be acquired by the other beneficiaries or the trustee. Courts have distinguished "first offer provisions" from other types of restrictions and have held them to be only a factor in considering value, rather then determinative of the value. Estate of Reynolds v. Commissioner, supra at 189; Spitzer v. Commissioner, 153 F.2d 967, 971 (8th Cir. 1946), affg. a Memorandum Opinion of this Court; Estate of Schulz v. Commissioner, 14 B.T.A. 419, 420 (1928). We find it most telling in this case that the beneficiaries (including petitioner, who held a larger percentage interest than seven of the other beneficiaries) and the trustee did not require decedent's sister's estate to sell the sister's interest to them at the dry farmland price. Instead, upon decedent's sister's death, that 20-percent interest was allowed to pass to a person who was related only by marriage and who had not executed the July 30, 1969, agreement *686 containing the restriction on sale or transfer. Under the circumstances of this case, we must agree with respondent that the restrictions on sale or transfer would have a relatively small effect upon the value of decedent's 20-percent interest at the time of her death. The land was being utilized as irrigated farmland and valuable crops were being harvested from the irrigated land. To value the realty as dry farmland based upon the July 30, 1969, agreement between the beneficiaries, trustors, and trustee would be to give excessive weight to the restrictions in this case. In reality, decedent, along with her children, nephews, nieces, and parents, were in a position to sell the property as irrigated property when they wished. On the occasion of decedent's sister's death, the property was transferred to decedent's brother-in-law without any first offer restriction upon his ability to sell the land for its irrigated value. Accordingly, we hold that the subject realty should be valued, for estate tax purposes, at the irrigated farmland fair market value. We further hold that the irrigated farmland value should be discounted due to the restrictions on sale or transfer. The appropriate *687 percentage discount will be discussed infra. Minority Discount
Real estate valuation, and the question of fractional interest discount, is a question of fact to be resolved on the basis of the entire record. Estate of Fawcett v. Commissioner, 64 T.C. 889, 898 (1975); Estate of Campanari v. Commissioner, 5 T.C. 488 (1945); Estate of Henry v. Commissioner, 4 T.C. 423 (1944), affd. 161 F.2d 574 (3d Cir. 1947). Respondent offered no expert testimony. Petitioner's expert, Dunshee, discounted for fractional and minority interests in real property by 25 and 35 percent when considered as dry or irrigated farmland, respectively. Dunshee applied the minority discounts after reviewing the report of Curtis R. Kimball of Willamette Management Associates (Kimball), and no separate rationale or support for the discounts is contained in Dunshee's report. Essentially, we rejected the Kimball report because it did not focus upon whether a minority discount was customary in the area of the subject realty, or upon any specific reasons to discount the Quinto property, and/or the comparable amounts of similar discounts in *688 the area of Quinto. The Kimball report was premised upon legal conclusions, and we found Kimball incompetent to render legal opinions. The Kimball report also contained references to studies and articles concerning discounts for undivided interests, but we were unable to relate those articles to the specific property under consideration. Accordingly, there is inadequate support for the specific discounts of 25 or 35 percent in Dunshee's report. Although this type of bare testimony has been rejected in the past, see Estate of Barclay v. Commissioner, supra, and Estate of Claflin v. Commissioner, supra, there are additional facts in this case which would support a discount in an amount less than those used by Dunshee. While other sales of fractional interests in real estate would be good indicators of fair market value, in this case there were no comparable fractional interest sales, unlike Estate of Barclay v. Commissioner, supra, and Estate of Baer v. Commissioner, supra. Obviously, if the owner of a 20-percent undivided interest wished to sell or transfer his or her interest, a partition or other legal controversy may result. We are persuaded *689 that there would be court costs, legal fees, and appraisal costs associated with any partition or other legal proceeding. In addition, even a sale of the entire parcel without partition may entail communication with heirs that reside throughout the United States. Percentage Discount Redetermined
The trier of the fact is not bound by an expert's view or opinion, but may use them to assist in deciding upon a value. Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. a Memorandum Opinion of this Court; Chiu v. Commissioner, 84 T.C. 722, 734 (1985). One expert may be persuasive on a particular element of valuation and another expert may be persuasive on another element. Parker v. Commissioner, 86 T.C. 547, 562 (1986). Consequently, we may adopt some and reject other portions of expert reports or views. Helvering v. National Grocery Co., 304 U.S. 282 (1938). We find the 35-percent discount Dunshee applied for the minority interest to be excessive. A 15-percent discount is more appropriate here because of the nature and use of the land. We do agree, however, that some amount must be considered *690 for the lack of the ownership of irrigation facilities and the fact that the interest is not comprised of contiguous portions of land. Those factors, considered together, warrant an additional 10-percent discount to be added to the 15 percent determined for the minority interest. The restrictions on decedent's sale or transfer of her interest, although only of a "first offer" nature, present an impediment that a hypothetical buyer would consider and would require some adjustment to the seller's offering price. Further, the terms of the agreement may generate controversy and litigation. Based on these considerations, we find that an additional 15-percent discount should be added, resulting in a total discount of 40 percent from the total undiscounted fair market value of petitioner's 20-percent interest in the 1,212.4 acres as of the date of her death. Dunshee valued the entire 1,212.4 acres, as of August 8, 1982, at $ 3,329,970, and accordingly our starting figure is $ 665,994 or 20 percent of the total. From this apportioned value, we subtract 40 percent (or $ 266,398), representing the discounts for the minority interest and other impediments described above, to arrive at *691 a fair market value of $ 399,596 for decedent's 20-percent interest on August 8, 1982. To reflect the foregoing and concessions of the parties, Decision will be entered under Rule 155. Footnotes
1. This portion of Dunshee's valuation is apparently based on use of the land as dry farmland and the remaining two valuations were based on use as irrigated farmland, even though most of the land was being utilized as irrigated farmland.↩
2. To bolster Dunshee's discounts for the minority interest and restrictions, petitioner also offered Curtis R. Kimball as an expert in the valuation of intangibles. Although Mr. Kimball's report was received, it is of no assistance to our consideration of this case because the conclusions contained therein are either legal conclusions, which the parties agreed Mr. Kimball was incompetent to render, or the conclusions did not have relevance and comparability to the subject property so as to be of assistance in our factual consideration of this case.↩