T.C. Memo. 1997-380


UNITED STATES TAX COURT


CAMERON W. BOMMER REVOCABLE TRUST, RONALD BOMMER, TRUSTEE,
Petitioner <u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent


ESTATE OF CAMERON W. BOMMER, DECEASED, MARCELLA BOMMER,
EXECUTRIX, RONALD J. BOMMER, RESIDUARY TRUSTEE, TRUSTEE, AND
EXECUTOR, CAMERON M. BOMMER, EXECUTOR, RONALD BOMMER, II,
EXECUTOR, KELLY LONG, EXECUTRIX, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 15484-94, 15485-94.      Filed August 20, 1997.


<u>Marc W. Rubin</u>, <u>Burgess L. Doan</u>, <u>Janet L. Houston</u>, and

<u>Michael R. Schmidt</u>, for petitioners.

<u>Robin L. Herrell</u> and <u>Matthew J. Fritz</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

RUWE, Judge:  In docket No. 15484-94, respondent determined a deficiency in petitioner Cameron W. Bommer Revocable Trust's generation-skipping transfer tax in the amount of $1,117,233.  In docket No. 15485-94, respondent determined a deficiency in petitioner Estate of Cameron W. Bommer's Federal estate tax in the amount of $4,393,397 and generation-skipping transfer tax in the amount of $1,117,233.

The issue before us is the effect, if any, of a restrictive stock agreement on the value of certain stock in CamVic Corp. that is includable in the Estate of Cameron W. Bommer (decedent). We severed this issue for trial and opinion.  The remaining issues, if not settled, will be decided in subsequent proceedings.

Unless otherwise indicated, all section references are to the Internal Revenue Code as in effect for the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts is incorporated herein by this reference.

Decedent was born January 9, 1913, and died testate on September 10, 1990. Decedent was survived by his wife, Marcella Bommer (Marcella), his only child, Ronald J. Bommer (Ronald), and Ronald's three children: Cameron M. Bommer (Cameron M.), Kelly Long, and Ronald Bommer II (Ronald II).[1] Decedent and Marcella were married in the early 1930's, and they remained married until decedent's death.

On September 19, 1990, Marcella was appointed the executrix of decedent's estate.[2] On June 4, 1991, Marcella filed a United States Estate (and Generation-Skipping Transfer) Tax Return (Form 706) on behalf of the estate. On August 23, 1991, decedent's estate was closed, final distributions were made from the estate, and Marcella was discharged as executrix.

## 1. CamVic Corp.

CamVic Corp. (CamVic) is a closely held company that was incorporated in the State of Ohio on October 17, 1958. Decedent and Victor Fay started CamVic with total capital contributions of

---

[1]At the time the petitions were filed in these cases, Marcella, Ronald, and Cameron M. Bommer and Kelly Long all resided in Cincinnati, Ohio, while Ronald II resided in South Orange, New Jersey.

[2]The business office for decedent's estate was in Cincinnati, Ohio, at all times during the pendency of the estate. The business address of the Cameron W. Bommer Revocable Trust is also in Cincinnati, Ohio.

$500.[3]  Of the five voting shares of CamVic issued at its inception, two shares were held by decedent, one share was held by Marcella, and two shares were held by Victor Fay.

At the time of decedent's death, CamVic owned and managed real property in Ohio, Indiana, and Florida.  See <u>infra</u> p. 16. Ronald, who began working at CamVic in 1959, drew the plans for and supervised the construction of several of CamVic's properties.  Ronald was also responsible for the management and maintenance of the properties.

As of May 11, 1965, the ownership of CamVic was as follows:

| Individual | Shares Owned |
| --- | --- |
| Decedent | 131 |
| Marcella | 1 |
| Victor Fay | 88 |

On this date, Victor Fay sold his entire interest in CamVic to the corporation for $21,654.16 and was replaced by Ronald on the board of directors.

On June 21, 1971, CamVic was merged with two other corporations owned by the Bommer family--Bommer Road Golf Course, Inc.[4] (BRGC), and Bommer Builders, Inc.[5]  CamVic was the

---

[3]Decedent was initially employed in the building trades; for several years prior to 1954, decedent and Victor Fay operated a partnership known as Bommer Builders.

[4]BRGC was incorporated on Oct. 13, 1969.  The record contains no evidence with respect to the amount of any capital contributions to BRGC.  BRGC began operations in 1970 with a

(continued...)

surviving corporation in the merger.  The value of CamVic stock used to compute the exchange ratio for the merger was $14,192.45 per share.

On January 5, 1973, decedent created the Cameron W. Bommer Trust (CWB Trust),[6] to which he transferred his entire interest in CamVic.  Although revocable during decedent's lifetime, the trust was to become irrevocable upon his death.  Decedent reserved the right to vote his CamVic stock as well as to preclude its sale or transfer during his lifetime.  Kenneth Hughes was the sole trustee of the CWB Trust from its inception through April 27, 1981, when he was replaced by Ronald.  Ronald remained sole trustee through the date of decedent's death.[7]

---

[4](...continued)
driving range.  A par three, nine-hole golf course, a pro shop, and a snack bar were added later.  CamVic continued to operate the facilities until the end of 1977.

[5]Bommer Builders, Inc., was incorporated on Dec. 22, 1953. Decedent and Victor Fay owned 105 and 70 shares, respectively. These shares were issued in consideration for the transfer of all assets and the assumption of all liabilities of Bommer Builders partnership.  The sale documents listed the net value of the assets of Bommer Builders partnership at the time of the transfer at $17,500.

[6]The trust was amended or revised on Apr. 27, 1981, Aug. 27, 1982, July 22, 1986, Jan. 27, 1987, Feb. 28, 1990, and June 5, 1990.  The documents clearly indicate on their face that they are amendments, and they also state the dates upon which they were executed.

[7]Subsequent to decedent's death and pursuant to the terms of the CWB Trust, three new trusts were created:  The Credit Shelter Trust, the Exempt QTIP Trust, and the QTIP Trust.

Until the time of decedent's death, CamVic stock was the only asset held by the trust.

During 1969 through 1975, decedent filed gift tax returns or amended gift tax returns on the dates listed below, which reflected the following gifts of CamVic stock, as well as their per-share value:

| Date of Gift | Date of Gift Tax Return | No. of Shares | Recipient of Gift | Per-share Value |
|---|---|---|---|---|
| 07/01/68 | 01/08/69 | 9 | Ronald | $7,091.07 |
| 01/02/72 | 12/28/73 | .3972 | Ronald II | 15,105.74 |
| 01/02/72 | 12/28/73 | .3972 | Cameron M. | 15,105.74 |
| 01/02/72 | 12/28/73 | .3972 | Kelly Long | 15,105.74 |
| 01/02/72 | 04/17/74 | .3972 | Ronald | 15,105.74 |
| 12/20/72 | 12/28/73 | .3972 | Ronald II | 15,105.74 |
| 12/20/72 | 12/28/73 | .3972 | Cameron M. | 15,105.74 |
| 12/20/72 | 12/28/73 | .3972 | Kelly Long | 15,105.74 |
| 12/20/72 | 04/17/74 | .3972 | Ronald | 15,105.74 |
| 01/04/74 | 04/17/74 | .3972 | Ronald II | 15,105.74 |
| 01/04/74 | 04/17/74 | .3972 | Cameron M. | 15,105.74 |
| 01/04/74 | 04/17/74 | .3972 | Kelly Long | 15,105.74 |
| 01/04/74 | 04/17/74 | .3972 | Ronald | 15,105.74 |
| 01/01/75 | 05/13/75 | .5294 | Ronald II | 11,333.30 |
| 01/01/75 | 05/13/75 | .5294 | Cameron M. | 11,333.30 |
| 01/01/75 | 05/13/75 | .5294 | Kelly Long | 11,333.30 |
| 01/01/75 | 05/13/75 | .5294 | Ronald | 11,333.30 |

Ronald served as custodian for all gifts to his children who were minors at that time.

The above gifts left the ownership of CamVic's stock as of January 1, 1975, as follows:

| Shareholder | Shares Owned | Percentage Owned |
|---|---|---|
| CWB Trust | 117.7568 | 86.0 |
| Marcella | 2.55013 | 1.9 |
| Ronald | 11.4256 | 8.9 |

| | | |
|---|---|---|
| Cameron M. | 1.721 | 1.3 |
| Ronald II | 1.721 | 1.3 |
| Kelly Long | 1.721 | 1.3 |

Following decedent's gifts of January 1, 1975, the ownership of CamVic's stock remained unchanged until decedent's death on September 10, 1990.

## CamVic's Subsidiaries

### A.  CamRon Corp.

CamRon Corp. (CamRon) was incorporated on August 19, 1965. Of the 1,000 shares issued, CamVic held 610, Joseph Klawitter and Joseph Westerhaus each held 145, and Edwin Fay held 100.  The shareholders paid $100 per share.  At the time of decedent's death, CamRon owned several real properties in Ohio and Missouri. See infra p. 17.

On August 30, 1965, a Stock Retirement Agreement was executed between CamRon and Messrs. Klawitter, Westerhaus, and Fay.  The agreement stated that "the Corporation will herein agree to purchase the shares of the said stock of any of the Stockholders in the event of his death, subject to all of the terms and provisions hereof".  CamRon would purchase the shares of a stockholder upon his death for $100 per share.  The agreement also provided that, in the event a shareholder desired to sell his shares during his lifetime, he was first required to offer the shares to the corporation at the stated price per

share. The agreement provided for periodic reevaluation of the stock price, and the price per share was, in fact, modified on several occasions. The final modification was executed on June 29, 1977, and increased the purchase price to $300 per share. CamVic, the majority shareholder, was not a party to the agreement.

On September 29, 1978, Messrs. Westerhaus and Klawitter sold their shares to CamRon for a price of $517.24 per share, which was in excess of the purchase price set forth in the modified agreement. Following the sale, CamVic held 610 shares of CamRon, and Edwin Fay held 100 shares. On June 30, 1982, CamVic sold to Edwin Fay 43 shares of CamRon stock for $517.25 per share. Following the sale, CamVic held 567 shares of CamRon (79.86 percent), and Edwin Fay held 143 shares (20.14 percent). On this same date, CamRon and Edwin Fay entered into an agreement whereby Edwin Fay agreed that if he desired to sell his shares, he would offer them first to CamRon and/or the other shareholders.

B. Ferguson Enterprises, Inc.

Ferguson Enterprises, Inc. (Ferguson), was incorporated on September 12, 1967. Upon incorporation, its stock was held as follows:

| Shareholder | No. of Shares |
|---|---|
| Edwin Fay | 2 |
| Joseph Westerhaus | 3 |
| Joseph Klawitter | 3 |

Marcella Bommer 10
Ronald Bommer 2

In November 1969, CamRon purchased 500 shares of Ferguson stock for $50,000, and the ownership of Ferguson's stock remained unchanged through 1975.

On November 17, 1967, Messrs. Klawitter, Westerhaus, and Fay executed a Stock Retirement Agreement with Ferguson, the terms of which were substantially similar to those contained in CamRon's Stock Retirement Agreement. On September 29, 1978, Messrs. Westerhaus and Klawitter each sold their shares in Ferguson to the corporation at a price of $833.33 per share, which was in excess of the price set forth in the Stock Retirement Agreement.

## 2. The CamVic Buy-Sell Agreement

On or after May 5, 1975,[8] CamVic and its shareholders executed a Buy-Sell Agreement, which provided, in pertinent part, as follows:

> WHEREAS, the Stockholders believe that certain restrictions upon the transfer of all the shares of the Corporation as hereinafter provided will serve in the best interests of the Stockholders;
>
> *   *   *   *   *   *   *
>
> 1. No Stockholder will sell, exchange or otherwise dispose of by gift or otherwise, except as hereinafter provided, any of the shares of the Corporation he now

---

[8]Although executed at this time, the Buy-Sell Agreement was dated Jan. 2, 1975.

owns or may hereafter acquire, nor encumber, pledge or hypothecate any of said shares.

2. In the event a Stockholder wishes to sell his shares of the Corporation or any part thereof, he must first offer to sell such shares to the Corporation at the price and on the terms hereinafter set out in Item 3 and 4 hereof and he shall give notice to Corporation of his desire to sell and the Corporation shall have fourteen (14) days after receipt of such notice within which to exercise its option. Upon failure of the Corporation to exercise such option within such time then the other Stockholders shall have and are hereby given their right and option for seven (7) days thereafter to purchase all the shares offered for sale by the selling Stockholder in the proportion of their stockholdings at the price and on the terms hereinafter set forth in Items 3 and 4 hereof. If neither the Corporation nor the other Stockholders exercise the option hereinabove given within the time specified, then said option shall terminate and the party desiring to sell shall be free to sell his shares of the Corporation to others. It is understood and agreed that unless all of the shares which the selling Stockholder has offered for sale are purchased by either the Corporation or the other Stockholders hereinafter provided, then the aforesaid option even if exercised, shall be null and void and the Stockholder shall be free to sell his said shares to others.

3. The purchase price of the shares of the Corporation to be paid by the Corporation or the Stockholder, in the event of any sale as provided for in Item 2 hereof, and as hereinafter set forth, shall be $11,333.30 per share.

4. In the event of a sale, the purchase price of said shares shall be paid with a ten per cent (10%) downpayment within sixty (60) days of the acceptance of the Offer to Purchase, and the remaining balance shall be payable in ten (10) annual installments of equal amounts on the anniversary date of the downpayment. The remaining balance shall bear interest at the rate of five per cent (5%) per annum. The purchasing Corporation or Stockholder, as the case may be, may pre-pay the balance at any time.

5. In the event of the death of a stockholder, he agrees to offer his shares of stock to the Corporation

or to the Stockholders, and said Corporation and other stockholders shall have the option to purchase his shares under the terms and conditions as set forth in Items 2, 3, and 4 above.

     *     *     *     *     *     *     *

13. This Agreement may be amended or altered by the written consent of the holder of at least seventy-five percent (75%) of the issued and outstanding shares of the Corporation.

At the time the Buy-Sell Agreement was executed, decedent held a beneficial interest through the CWB Trust in 86 percent of the outstanding stock in CamVic and had retained the right to vote those shares. In addition, Ronald owned 8.3 percent of the outstanding stock in CamVic, Marcella owned 1.9 percent, and Ronald's three children each owned 1.3 percent. The agreement did not provide for periodic revaluation of CamVic's stock.

A. The Computation of CamVic's Value for Purposes of the Buy-Sell Agreement

The computation of the value of CamVic stock for purposes of the Buy-Sell Agreement was prepared by Kenneth Hughes, an attorney and tax adviser to the Bommer family and its businesses. Mr. Hughes and his law firm, Santen, Santen & Hughes, served as legal counsel to all parties to the Buy-Sell Agreement.[9]

The parties have stipulated that Mr. Hughes computed CamVic's value as follows:

---

[9]Mr. Hughes died in January 1993.

| Assets | | Value |
|---|---|---|
| Cash & equivalents, notes & accounts receivable | | $71,310 |
| Inventory, prepaids & c.v.--insurance | | 33,434 |
| CamRon stock | | [1]474,515 |
| Equipment | | 2,000 |
| Unimproved land | | 121,000 |
| Dina Terrace & Dina Tower | | |
|   Land (at book value) | 137,961 | |
|   Improvements | 1,801,084 | |
| Total Dina Terrace & Dina Tower | | [2]1,939,045 |
| Total assets | | 2,641,304 |
| Less liabilities | | (1,089,825) |
| Net asset value | | 1,551,479 |
| Shares outstanding | | 136.895553 |
| | | |
| Per-share value | | $11,333.30 |

[1]On Dec. 31, 1974, CamVic held 610 shares (61 percent) of CamRon. For purposes of the Buy-Sell Agreement, CamRon's value was calculated as follows:

| Assets | Value |
|---|---|
| Cash & equivalents, notes & accounts receivable | $300,742 |
| Inventory, prepaids & c.v.--insurance | 5,063 |
| Ferguson stock | 50,000 |
| Equipment | 3,000 |
| Mobile home park | 300,000 |
| Hillenbrand nursing home | 950,000 |
| Land improvements | 25,000 |
| Total assets | 1,633,805 |
| Less liabilities | (855,912) |
| Net asset value | 777,893 |
| CamVic's ownership | 61% |
| | |
| CamVic's equity in CamRon | $474,515 |

Despite the above valuation, both parties agree that Ferguson's stock was virtually worthless at this time.

[2]Dina Terrace and Dina Tower are residential apartment complexes. For purposes of his valuation, Mr. Hughes computed the value of Dina Terrace and Dina Tower (excluding the land) by increasing rents for 1974 by a projected 6-percent inflation to project 1975 rents of $352,217, adding laundry income of $8,000, deducting operating expenses of $144,087, and capitalizing (at a

12-percent rate) the projected net earnings for 1975 of $216,130.

The computation was made during a meeting of Mr. Hughes, decedent, and Ronald on January 2, 1975.[10]  Mr. Hughes completed his computation in 1 day.  Neither the parties to the Buy-Sell Agreement nor Mr. Hughes obtained a professional business valuation of CamVic or a professional appraisal with respect to the value of any of the properties owned by CamVic or its subsidiaries prior to acceptance of the $11,333.30 per-share price set forth in the agreement.[11]

### B. The Revised Agreement

In or around April 1981, decedent, CamVic, and its minority shareholders entered into a revised version of the Buy-Sell Agreement (Revised Agreement).  Attorneys Kenneth Hughes and Gary Hoffman and their law firm, Santen, Santen & Hughes, served as legal counsel to all parties to the Revised Agreement.

The only significant modification made in the Revised Agreement was that paragraph 13 was changed with respect to the percentage of stock ownership necessary to amend the terms of the agreement.  The Revised Agreement provided that the written

---

[10]None of CamVic's other shareholders participated in this meeting.

[11]The only professional appraisal used in the computation was an appraisal of an unimproved parcel of land owned by CamVic, which had been appraised at $121,000 approximately 2 years earlier on May 7, 1973.

consent of the holders of at least seven-eighths (87.5 percent) of CamVic's stock was necessary to amend the terms of the Buy-Sell Agreement.[12]

On two pages of contemporaneous, handwritten notes relating to the 1981 revision of the Buy-Sell Agreement, an attorney with Santen, Santen & Hughes recorded the following:

> [On page 1]  Addendum @ para 13 changed
> 75% control to 7/8 rather than .875
> purpose is to set estate tax value; * * *
>
>      *     *     *     *     *     *     *
>
> [On page 2] purpose we want $11k/sh value @ death
> * * *[13]

The Revised Agreement did not permit decedent to amend its terms unilaterally.  Nevertheless, it permitted him to amend them with his wife Marcella's consent.[14]  Moreover, if Marcella predeceased him, decedent could have acquired the requisite percentage of stock through the purchase option and then would

---

[12]The original Buy-Sell Agreement permitted the holder of 75 percent of CamVic stock to amend the terms of the agreement.

[13]These quotes are excerpts.  The other portions of the notations deal with the Bommer family wills and trusts and the CamVic Buy-Sell Agreement.

[14]The record indicates that Marcella did not take an active role in CamVic's affairs.

have been able to amend the terms of the Revised Agreement unilaterally.[15]

The Revised Agreement did not change the $11,333.30 per-share purchase price for the CamVic stock, nor did it contain a provision requiring reevaluation of the stock price. The parties did not negotiate with respect to the price per share before entering into the Revised Agreement. The Revised Agreement was titled "Buy-Sell Agreement", the same as the agreement executed in 1975. It provided at the outset that it was "made and entered into as of the 2nd day of January, 1975". In addition, Ronald signed the Revised Agreement as the custodian for each of his children, although he was no longer the custodian of Cameron M. or Ronald II in 1981, and he signed the agreement as the secretary of CamVic, his position in January 1975. In 1981, however, Ronald was CamVic's corporate president. Similarly, decedent signed the Revised Agreement as president of CamVic--his position in 1975--even though decedent was corporate secretary in 1981.[16]

---

[15]Decedent would have had 87.5 percent of CamVic's stock had either he or CamVic exercised the right to purchase Marcella's stock.

[16]None of decedent's grandchildren had signed the original Buy-Sell Agreement. However, his grandchildren's signatures appear on the Revised Agreement. The grandchildren did not date their signatures on the Revised Agreement; rather, Ronald inserted the dates. Cameron M.'s signature is dated Apr. 26, 1978, the date of his 18th birthday, which fell approximately 3 years before the execution of the Revised Agreement. Ronald II's
(continued...)

## 3.  CamVic's and CamRon's Real Property Holdings

CamVic owned the following real properties during the time periods relevant to this case:

| County Property | Owned in May 1975 | Owned in April 1981 | Owned in 1990 | 1975 Property Hamilton County Tax Valuation[1] | 1981 Property Hamilton Tax Valuation |
|---|---|---|---|---|---|
| Dina Terrace Cincinnati, Ohio | Y | Y | Y | $557,700 | $737,240 |
| Dina Tower Cincinnati, Ohio | Y | Y | Y | 164,570 | 215,450 |
| 1.7954 acres Boudinot Ave. Cincinnati, Ohio[2] | Y | Y | Y | 18,360 | 22,990 |
| Condominium in Gulf's Harbor's Condominiums New Port Richey, Florida[3] | N | Y | N | -- | -- |
| Victory Tower Cincinnati, Ohio[4] | N | Y | N | -- | [5]300,941 |
| 3 commercial properties Jacksonville, Florida | N | N | Y | -- | -- |
| Apartments Cincinnati, Ohio | N | N | Y | -- | -- |
| Apartments Batesville, Indiana | N | N | Y | -- | -- |
| Commercial property Heath, Ohio | N | N | Y | -- | -- |

[1]The record contains valuations only for properties located in Hamilton County, Ohio.  Hamilton County computes the assessed valuation of real property by multiplying the county's estimate of market value by 35 percent.

[2]On Oct. 16, 1990, CamVic made a partial sale of the Boudinot land for $72,093; it had acquired the entire property on Nov. 12, 1958, for $3,311.

---

[16](...continued) signature is dated Aug. 15, 1979, the date of his 18th birthday, which fell approximately 2 years before the execution of the Revised Agreement.

[3]CamVic purchased this condominium in 1977 for $25,500 and sold it in May 1985 for $42,550.

[4]Victory Tower was acquired on June 15, 1979, for $750,000 and sold on Mar. 20, 1986, for $1,050,000.

[5]CamVic successfully protested Victory Tower's 1981 Hamilton County tax valuation, and the county revised its assessed tax valuation from $300,940 to $280,000.

During these same years, CamRon owned the following real properties:

| Property | Owned in May 1975 | Owned in April 1981 | Owned in 1990 | 1975 Property Hamilton County Tax Valuation | 1981 Property Hamilton County Tax Valuation |
|---|---|---|---|---|---|
| Hillenbrand nursing Ctr. Cincinnati, Ohio | Y | Y | Y | $241,970 | $319,660 |
| Martin mobile park home Cincinnati, Ohio | Y | Y | Y | unknown | unknown |
| Apartments (Lakeview) Cincinnati, Ohio[1] | N | Y | Y | -- | 134,000 |
| Commercial property Middletown, Ohio | N | N | Y | -- | -- |
| Commercial property St. Louis, Missouri | N | N | Y | -- | -- |

[1]CamRon acquired four apartment buildings on June 30, 1975, for $285,000 and sold one of these buildings on Nov. 15, 1988, for $140,000.

## 4. Decedent's Death and Subsequent Events

Decedent died on September 10, 1990. The parties have stipulated that 117.7568 shares of CamVic stock, which he beneficially owned through the CWB Trust, were includable in his gross estate pursuant to section 2036(a).

On November 26, 1990, the following transfers of CamVic stock occurred:[17]

| Transferor | Transferee | No. of Shares | Payment Method |
|---|---|---|---|
| CWB Trust | Estate of Cameron W. Bommer | 9.8647 | [1] |
| CWB Trust | Credit shelter trust | 47.001 | [1] |
| CWB Trust | Exempt QTIP trust | 14.0204 | [1] |
| CWB Trust | QTIP trust | 46.47 | [1] |
| Estate of Cameron W. Bommer | CamVic | 9.8647 | Cash |
| Credit shelter trust | CamVic | 6.3059 | Cash |

[1]Transferred pursuant to terms of the trust rather than sales.

On December 1, 1990, the following transfers of CamVic stock took place:

| Transferor | Transferee | No. of Shares | Payment Method |
|---|---|---|---|
| Credit shelter trust | Ronald | 6.5002 | Cash/Note |
| Credit shelter trust | Cameron M. GC trust | 16.2048 | Cash/Note |
| Credit shelter trust | Kelly Long GC trust | 16.2048 | Cash/Note |
| Credit shelter trust | Ronald II GC trust | 2.1844 | Cash/Note |
| Exempt QTIP trust | Ronald II GC trust | 14.0204 | Cash/Note |
| QTIP trust | CamVic | 46.4716 | Cash/Note |
| Marcella | CamVic | 2.55013 | Cash |

Pursuant to the terms of the Buy-Sell Agreement, the transfer price was $11,333.30 per share. Payments which consisted of a combination of cash and a promissory note were made pursuant to the following terms: A 10-percent cash downpayment and a promissory note to pay 10 annual installments with the unpaid balance accruing interest at a 5-percent annual rate.

---

[17]In addition, Kelly Long transferred her 1.7210 shares of CamVic to the Kelly Long GC Trust, Cameron M. transferred his 1.7210 shares to the Cameron M. GC Trust, and Ronald II transferred his 1.7210 shares to the Ronald II GC Trust. All three transfers were made on Nov. 26, 1990.

Subsequent to these transfers, there were 71.703223 outstanding shares of CamVic stock, which were owned as follows:

| Shareholder | No. of Shares | Percentage Held |
|---|---|---|
| Ronald | 17.9258 | 25 |
| Cameron M. GC trust | 17.9258 | 25 |
| Kelly Long GC trust | 17.9258 | 25 |
| Ronald II GC trust | 17.9258 | 25 |

Respondent refused to accept petitioners' $11,333.30 per-share valuation of decedent's beneficial interest in 117.7568 shares of CamVic stock as reported on Schedule G of the Federal estate tax return.  In the notices of deficiency in these cases, respondent determined that the fair market value of the shares of CamVic stock includable in decedent's gross estate was $75,278.22 per share. Consequently, respondent increased decedent's gross estate in the amount of $7,529,951.

## OPINION

The only issue we address in this opinion is the effect, if any, of CamVic's restrictive stock agreement on the value of the CamVic stock includable in decedent's gross estate pursuant to section 2036(a).

The gross estate includes the value of all property to the extent of the decedent's interest therein at the time of his death. Estate of Smith v. Commissioner, 108 T.C. ___, ___ (1997) (slip op. at 11).  The standard for valuation is fair market value, which is

defined as "'the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.'"  United States v. Cartwright, 411 U.S. 546, 551 (1973) (quoting section 20.2031-1(b), Estate Tax Regs.).  The determination of fair market value is a question of fact.  Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990); Estate of Gilford v. Commissioner, 88 T.C. 38, 50 (1987).  If the relevant property is stock that is not listed on any exchange, and cannot be valued with reference to bid and asked prices or historical sales prices, the value of listed corporations engaged in the same or a similar line of business should be considered.  Sec. 2031(b).

The value of corporate stock may be limited for Federal estate tax purposes as a result of an enforceable buy-sell agreement or option contract which fixes the price at which the stock may be offered for sale to the remaining shareholders.  See, e.g., St. Louis County Bank v. United States, 674 F.2d 1207, 1210 (8th Cir. 1982); May v. McGowan, 194 F.2d 396, 397 (2d Cir. 1952); Lomb v. Sugden, 82 F.2d 166, 167 (2d Cir. 1936); Wilson v. Bowers, 57 F.2d 682, 684 (2d Cir. 1932); Estate of Gloeckner v. Commissioner, T.C. Memo. 1996-148; Estate of Lauder v. Commissioner, T.C. Memo. 1992-736; Rudolph v. United States, 71 AFTR 2d 93-2169, 93-1 USTC par. 60,130 (S.D. Ind. 1993).

Courts have developed a set of requirements for determining whether the price set forth in a restrictive agreement controls for purposes of the Federal estate tax. In Estate of Lauder v. Commissioner, supra, we summarized these requirements:

> It is axiomatic that the offering price must be fixed and determinable under the agreement. In addition, the agreement must be binding on the parties both during life and after death. Finally, the restrictive agreement must have been entered into for a bona fide business reason and must not be a substitute for a testamentary disposition. [Citations omitted.]

See also St. Louis County Bank v. United States, supra at 1210; Estate of Gloeckner v. Commissioner, supra.

We will first analyze the original Buy-Sell Agreement under the standard set forth in Estate of Lauder v. Commissioner, supra. Respondent concedes that the Buy-Sell Agreement established a fixed and determinable price for the stock. Thus, we shall focus on the remaining three requirements.

The first requirement is whether decedent was bound by the terms of the original Buy-Sell Agreement executed in May 1975. Petitioners maintain that it was not intended that decedent would have the unilateral ability to amend the terms of the Buy-Sell Agreement. Petitioners argue that the original agreement controls, since, in their view, the purpose of the Revised Agreement was simply to correct a "scrivener's error"; i.e., the percentage of stock ownership necessary to alter the terms of the agreement. The parties agree that the only significant change produced by the

Revised Agreement was the percentage of stock ownership necessary to change the terms of the agreement.

Petitioners argue that the original Buy-Sell Agreement was a binding contract enforceable under Ohio State law.  Respondent maintains that section 20.2031-2(h), Estate Tax Regs., sets forth the applicable standard for determining whether a restrictive stock agreement is controlling for estate tax purposes.  This regulation provides that "Little weight will be accorded a price contained in an option or contract under which the decedent is free to dispose of the underlying securities at any price he chooses during his lifetime."  Sec. 20.2031-2(h), Estate Tax Regs.; see also Estate of Matthews v. Commissioner, 3 T.C. 525, 528-529 (1944); Hoffman v. Commissioner, 2 T.C. 1160, 1178-1179 (1943), affd. sub nom. Giannini v. Commissioner, 148 F.2d 285 (9th Cir. 1945).  Respondent asserts that the original Buy-Sell Agreement was not binding on decedent during his lifetime because he had the power to unilaterally alter its terms.  We agree.

The original Buy-Sell Agreement, executed in May 1975, expressly provided that "This Agreement may be amended or altered by the written consent of the holder of at least seventy-five percent (75%) of the issued and outstanding shares of the Corporation." Decedent owned a beneficial interest (via the CWB Trust) in 86 percent of CamVic's outstanding stock on the date the Buy-Sell Agreement was executed and for the remainder of his life.  This beneficial interest included the right to vote the shares.  Thus,

the plain wording of the Buy-Sell Agreement leaves no question as to the unilateral authority that decedent possessed. Decedent singlehandedly could have altered the price-per-share clause, as well as any other terms of the agreement.

Ronald testified that the parties to the original agreement never intended that decedent should have the unilateral right to amend and that, in 1981 (6 years later), Ronald discovered this "error" in the agreement. We cannot accept this explanation. The evidence indicates that decedent was a man who liked to control his affairs. In 1975, he was 62 years old and in good health. The language of the agreement is clear. It was signed in 1975 by decedent, Ronald, and Kenneth Hughes. Mr. Hughes prepared the agreement and was also the trustee of the CWB Trust. We have no doubt that decedent, Ronald, and the attorneys at Santen, Santen & Hughes recognized that the agreement gave decedent the authority to amend the agreement. Under these circumstances, we need not, and do not, accept Ronald's self-serving and uncorroborated testimony that the 1981 change was simply a correction of a scrivener's error in the 1975 Buy-Sell Agreement. See Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).

Petitioners assert that the agreement is valid for estate tax purposes even if decedent had the power to change its terms. Petitioners contend that our decision in Estate of Bischoff v. Commissioner, 69 T.C. 32 (1977), supports their position. In Estate of Bischoff v. Commissioner, supra at 42, we found that a

partnership's restrictive buy-sell provisions were not merely a substitute for a testamentary disposition to the natural objects of each decedent's bounty. In doing so, we rejected the Commissioner's argument that the partnership agreement could have been amended to circumvent the restrictive buy-sell provisions. Petitioners maintain that our observation in a footnote in Estate of Bischoff v. Commissioner, supra at 42 n.10, that the provisions of the agreement were adhered to following the deaths of several partners (including the decedents) indicates that an agreement will be respected for estate tax purposes so long as the parties adhere to its terms. We disagree. In Estate of Bischoff v. Commissioner, supra at 36, the two decedents, who were husband and wife, owned partnership interests of only 12.5 percent and 14.286 percent, respectively, at their deaths.[18] In addition, although one of the decedents was the sister of another of the partners, we noted that "respondent does not contend that the Bischoff and Brunckhorst families were the natural objects of each other's bounty. Moreover, there is no evidence which would support such a contention." Id. at 42 n.10. In the instant case, in contrast, the terms of the original Buy-Sell Agreement expressly provided that decedent possessed the authority to alter the agreement's terms at any time, and the natural objects of decedent's bounty were the other shareholders of CamVic stock.

---

[18]Since the partnership generally retired each partner's interest upon his withdrawal or death, the interests owned by the decedents at their deaths were presumably their largest. See Estate of Bischoff v. Commissioner, 69 T.C. 32, 36 (1977).

Petitioners argue that decedent would have breached his fiduciary duty to the other CamVic shareholders if he had unilaterally altered the provisions of the agreement to his advantage and the minority shareholders' detriment. As a result, petitioners contend that the agreement, despite its literal terms, was nevertheless binding on decedent during his lifetime. Petitioners' argument is unpersuasive, as it is certainly not a breach of any fiduciary duty for a majority shareholder to sell his stock at the highest price possible. The original Buy-Sell Agreement provided decedent with the ability to amend the agreement in order to reflect a contemporary per-share price at which the corporation would purchase a shareholder's stock upon his withdrawal or at death.

The next issue is whether the terms of the Revised Agreement executed in 1981 were binding on decedent. Pursuant to the Revised Agreement, the holders of at least 87.5 percent of CamVic stock could alter the terms of the agreement. While decedent held a beneficial interest in only 86 percent of the corporation's stock, his wife Marcella owned an additional 1.9 percent. Marcella did not actively participate in the affairs of the corporation. With Marcella's interest, decedent would have held the requisite amount of stock ownership to alter the agreement. Decedent also could have gained the required percentage if Marcella had predeceased him.[19] We

---

[19]Had Marcella died, her stock would also have been subject
(continued...)

note that decedent's son, Ronald, and Ronald's three children, i.e., those shareholders with interests presumably adverse to the interests of an older majority shareholder, never had the ability by themselves to prevent decedent from amending the Revised Agreement. We view the Revised Agreement as an attempt to remedy an estate tax problem, while at the same time allowing decedent to retain the effective ability to alter the terms of the Revised Agreement.

For the foregoing reasons, we hold that neither the original Buy-Sell Agreement nor the Revised Agreement was binding on decedent during his lifetime. Nevertheless, even assuming that either agreement is construed as binding, petitioners still would not prevail because, as explained later, we believe that the Buy-Sell Agreement and Revised Agreement were testamentary devices to transfer decedent's interest in CamVic's stock to the natural objects of his bounty.

Section 20.2031-2(h), Estate Tax Regs., provides, in relevant part:

> Even if the decedent is not free to dispose of the underlying securities at other than the option or contract price, such price will be disregarded in determining the value of the securities unless it is determined under the circumstances of the particular case that the agreement represents a bona fide business arrangement and not a device to pass the decedent's shares to the natural

[19](...continued) to the Buy-Sell Agreement. Had either CamVic or decedent (through the CWB Trust) exercised the option rights to purchase Marcella's shares, decedent would have controlled over 87.5 percent of the shares.

> objects of his bounty for less than an adequate and full
> consideration in money or money's worth. * * *

As the language indicates, for the price set forth in the agreement to control, the agreement must serve a bona fide business purpose and also must not constitute a testamentary device. Estate of Gloeckner v. Commissioner, T.C. Memo. 1996-148; Estate of Lauder v. Commissioner, T.C. Memo. 1992-736. Since the issues are interrelated, we will consider them in tandem.

Legitimate business purposes are often inextricably mixed with testamentary objectives where, as here, the parties to a restrictive stock agreement are all members of the same immediate family. Estate of Lauder v. Commissioner, supra; see also 5 Bittker & Lokken, Federal Taxation of Income, Estates and Gifts, par. 135.3.10, at 135-59 to 135-60 (2d ed. 1993). Accordingly, intrafamily agreements restricting the transfer of stock in a closely held corporation are subject to greater scrutiny than that given to similar agreements between unrelated parties. Dorn v. United States, 828 F.2d 177, 182 (3d Cir. 1987); Harwood v. Commissioner, 82 T.C. 239, 259 (1984), affd. without published opinion 786 F.2d 1174 (9th Cir. 1986); Estate of Lauder v. Commissioner, supra.

Petitioners raise several business purposes which they contend were furthered by the Buy-Sell Agreement. First, they maintain that the agreement was intended to preserve family control within the group consisting of the CamVic shareholders. The preservation of

family ownership and control of a corporation has been recognized in certain cases as a legitimate business purpose. See Estate of Bischoff v. Commissioner, 69 T.C. at 39-40; Estate of Littick v. Commissioner, 31 T.C. 181, 187 (1958); Estate of Lauder v. Commissioner, supra.

Petitioners also assert that the Buy-Sell Agreement was intended to prevent Ronald from leaving CamVic. Respondent contends that the evidence fails to demonstrate that Ronald was uniquely qualified for any of his responsibilities at CamVic such that there was a bona fide business need to retain him.

Ronald began working for CamVic in 1959. Ronald testified that he supervised the construction of Dina Terrace, and he drew the plans for and supervised the construction of Dina Tower. When these apartments were completed, Ronald managed the properties for CamVic. Moreover, Ronald testified that he and decedent had conflicting business philosophies. Ronald stated that he believed CamVic should build and manage properties, whereas decedent had a build and sell philosophy. Ronald further testified that decedent had previously made impulsive business decisions which Ronald believed were to the detriment of CamVic. For instance, Ronald testified that decedent had constructed a golf course on land unsuitable for that purpose, purchased a mobile home park in a flood plain at a price above the land's appraised value, and insisted on purchasing nearly 4 acres of land for a car wash when a half acre was sufficient. Ronald stated

that these concerns prompted him to approach Mr. Hughes, who, in turn, suggested the efficacy of a restrictive stock agreement.

Following our review of the record, we find that Ronald's retention played some part in the creation of the Buy-Sell Agreement. At the time the agreement was created, Ronald was relatively young and had already worked at CamVic for over 20 years. During that time, he had gained solid experience through his work with CamVic's properties. Ronald also had concerns with respect to his security in the business. Under these circumstances, we conclude that it was reasonable for Ronald to attempt to solidify his future at CamVic through the creation of a restrictive stock agreement.[20] We find that there was some business purpose for entering into the Buy-Sell Agreement and the Revised Agreement.

In order to meet the test set forth in section 20.2031-2(h), Estate Tax Regs., and applied in Estate of Lauder v. Commissioner, supra, petitioners must also demonstrate that the agreement was not intended as a device to pass decedent's interest in CamVic to the natural objects of his bounty for less than an adequate and full consideration in money or money's worth. Petitioners have failed to do this. For the reasons set forth below, we conclude that an inference may fairly be drawn that the Buy-Sell Agreement and the

---

[20]Nevertheless, we note that nothing in the Buy-Sell Agreement prevented Ronald from leaving CamVic or decedent from continuing to make "impulsive" business decisions. Decedent had the controlling interest in CamVic and could have caused CamVic to buy or sell properties.

Revised Agreement were designed to serve such a testamentary purpose.

First, the purchase price set forth in the agreements was fixed at $11,333.30 per share. It was not subject to any periodic reevaluation in order to account for an increase in CamVic's value. We find it unrealistic to assume that decedent, as the majority shareholder, would have negotiated a fixed price for the agreements if he had been bargaining with unrelated parties.[21]

Petitioners argue that the Buy-Sell Agreement was not a testamentary device because real estate values fluctuate and decedent had personally experienced these fluctuations in his own business. We fail to see how concern about the fluctuation in the value of real estate or CamVic's shares could have been a nontestamentary purpose for decedent to have agreed to a fixed price per share. The Buy-Sell Agreement granted a purchase option; it did

---

[21]We note that decedent was a general partner in the Oak Hills Investment Co. The partnership agreement, dated May 25, 1983, contained a similar restrictive transfer provision, which generally required the partners--if they desired to sell their interests in the partnership--to offer their interests to the partnership and then to the other partners pro rata. However, unlike the provision in CamVic's Buy-Sell Agreement, the partnership agreement's provision provided:

> the purchase price for said sale shall be the transferring Partner's pro-rata share of the appraised value of the net assets of the Partnership which shall be equal to that percentage of ownership of the withdrawing Partner times the fair market value of the assets owned by the Partnership at the time notice is given minus all debts and liabilities of the Partnership. * * *

not require CamVic or the other shareholders to buy the shares if tendered. If the value of the shares declined, below $11,333.30, the rights to buy shares pursuant to the agreement would not be exercised. Therefore, neither decedent nor his estate was protected in the event of declining values. On the other hand, if the value of real estate in general, and CamVic in particular, rose, neither decedent nor his estate could sell the controlling interest in CamVic for more than $11,333.30. The only beneficiaries of an increase in the value of CamVic's stock were the natural objects of decedent's bounty.

In addition to the fixed price per share, the generous payment terms of the Buy-Sell Agreement and the Revised Agreement are a further indication of their testamentary nature. Under the agreements, payments could be made pursuant to the following terms: A 10-percent cash downpayment and a promissory note to pay 10 annual installments with the unpaid balance accruing interest at a 5-percent annual rate. Petitioners' own expert witness stated that in the first half of 1975 banks were not granting loans to borrowers who had less than an AAA credit history, and the interest rate on business loans in excess of $1 million during this period was 11.81 percent. He also stated that in 1981 the prime interest rate exceeded 21 percent. Based on these figures, purchasers of CamVic under the agreements enjoyed the benefit of an interest rate that was less than one-half of the rate for 1975 and less than one-fourth of the rate for 1981.

We are also unpersuaded that decedent was anticipating a decline in value. There is no credible evidence suggesting that CamVic's value was declining at the time the original Buy-Sell Agreement was executed in 1975 or in 1981. Indeed, valuations of CamVic stock made between 1969 and 1974 indicate that CamVic's value was actually increasing during this time. On a gift tax return filed January 8, 1969, decedent reported the value of 9 shares of CamVic stock that he had gifted to Ronald at $7,091.07 per share. When CamVic later merged on June 21, 1971, with two other corporations owned by the Bommer family, the value of CamVic's stock for purposes of computing the exchange ratio for the merger was $14,192.45 per share. In addition, between 1972 and 1974, decedent made several gifts of CamVic stock to Ronald and his grandchildren. Each gift was valued for gift tax purposes at $15,105.74 per share.[22]

Second, an inference of testamentary device can be drawn from the manner in which the parties selected the $11,333.30 price per share for the purchase of CamVic stock. Decedent was an experienced businessman, yet he failed to obtain a professional appraisal of CamVic, its subsidiaries, or its real properties. Instead, decedent did nothing more than consult with his attorney Mr. Hughes. Decedent and Ronald had one meeting with Mr. Hughes, who completed his computation, upon which the above price per share was based, in

---

[22]With respect to the period from 1975 until approximately April 1981, when the Revised Agreement was executed, CamVic's increasing value is not disputed by petitioners or their expert witness.

1 day.  No bona fide negotiations occurred with respect to the stock price, as Mr. Hughes and his law firm represented all parties to the Buy-Sell Agreement.  Instead, the parties selected a value of $11,333.30 per share, a price which was approximately $4,000 less than the value decedent had reported for every gift of CamVic stock he made between 1972 and 1974.

In Estate of Lauder v. Commissioner, T.C. Memo. 1992-736, which was similar in this respect, we found that a restrictive stock agreement was intended as a substitute for a testamentary disposition.  In Estate of Lauder, we explained:

> We are most concerned with the arbitrary manner in which Leonard, an experienced businessman, adopted the adjusted book value formula for determining the purchase price of the stock under the agreements.  Leonard admitted that he arrived at the formula without a formal appraisal and without considering the specific trading prices of comparable companies.  Nor does it appear that Leonard obtained any significant professional advice in selecting the formula price.  Leonard settled on the book value formula himself after consulting with Arnold M. Ganz (a close family financial adviser now deceased). * * *[23]

No revaluation of CamVic stock occurred in 1981 prior to execution of the Revised Agreement.  Rather, the parties to the Revised Agreement simply reiterated the $11,333.30 price.  Notes of an attorney with Santen, Santen & Hughes in 1981 indicate that the

---

[23]In contrast, we note that CamRon's and Ferguson's Stock Retirement Agreements provided for periodic reevaluation of the stock price, and the majority shareholders of these corporations, i.e., CamVic and CamRon, respectively, were not parties to these agreements.

purpose of the 1981 Revised Agreement was to set the estate tax value.

On brief, petitioners argue that these notes provide no insight into decedent's intent, as the attorney who made the notes never met with decedent personally.  We disagree.  Petitioners have stipulated that the attorney's notes relate to the 1981 revision of the Buy-Sell Agreement.  Mr. Hughes and his law firm, Santen, Santen & Hughes, were decedent's longtime attorneys, and they represented all parties to the original Buy-Sell Agreement in 1975, as well as the Revised Agreement in 1981.  The Santen, Santen & Hughes attorneys served as decedent's advisers in this matter, and the notes made by an attorney with the firm at that time were business records of the firm.[24]  As a result, we find that the notes are relevant in establishing the purpose behind the execution of the Revised Agreement.[25]

---

[24]As a result of a pretrial discovery request by respondent, the notes were retrieved from storage by the law firm and given to petitioners.  Petitioners then objected to disclosure to respondent on the basis of attorney-client privilege.  In a pretrial order, we found that petitioners had waived any attorney-client privilege and ordered petitioners to produce the notes.  See Bernardo v. Commissioner, 104 T.C. 677 (1995).

[25]Petitioners argue that there is nothing to indicate that the attorney's notes are relevant to decedent's intent.  We find that the notes revealing the objectives of the attorneys for decedent are probative of decedent's intent.  The attorneys were acting on behalf of decedent and trying to achieve his objectives.  It is unrealistic to think that the concerns revealed in these notes were not shared with and concurred in by decedent.

Third, we believe that the Revised Agreement was misleading with regard to the date of execution.  The 1981 Revised Agreement was titled "Buy-Sell Agreement" and stated at the outset that it was "made and entered into as of the 2nd day of January, 1975", which was the date of the original Buy-Sell Agreement.  Nothing in the Revised Agreement states that it was a revision of a prior agreement.  Ronald signed the agreement as the custodian for each of his three children, although by 1981 he was no longer the custodian of two of them.  The agreement contains the signatures of Ronald's children, Cameron M., Ronald II, and Kelly Long with the respective dates April 26, 1978, August 15, 1979, and April 6, 1982.  These dates are the dates of their respective 18th birthdays.  Ronald wrote these dates on the Revised Agreement, despite the fact that two of the dates precede the creation of the document.  Ronald signed the Revised Agreement as secretary of CamVic, despite the fact that his position in 1981 was corporate president, and decedent signed as president of CamVic even though he was corporate secretary in 1981.  Decedent and his attorneys knew how to execute amendments by providing the correct date and identifying the document as a revision.  Indeed, the record indicates that they did just that when they amended the CWB Trust on several different occasions.[26]

---

[26]When respondent began the audit of the estate tax return, Ronald failed to disclose that the agreement had been revised in 1981.  At trial, Ronald testified that he "just didn't remember it at all."

Petitioners argue that courts have upheld fixed price agreements in similar circumstances and that case law supports their position. We disagree. The facts in the present case are clearly distinguishable from those in cases where fixed price agreements were upheld. For instance, in Estate of Littick v. Commissioner, 31 T.C. at 185, a corporation purchased the decedent's shares at death pursuant to a buy-sell agreement for a price that was less than the stock's fair market value on the date of the decedent's death. In holding the agreement controlling for estate tax valuation purposes, we stated that "there is nothing in the record to indicate that the $200,000 figure was not fairly arrived at by arm's-length negotiation or that any tax avoidance scheme was involved." Id. at 186. In Estate of Littick, the corporation had three shareholders who held almost equal shares, and this Court was convinced that the agreement was the product of arm's-length bargaining. In the instant case, in contrast, the Buy-Sell Agreement was executed following a single meeting among decedent, who was an 86-percent majority shareholder, Ronald, and Mr. Hughes, decedent's longtime attorney who represented all parties to the agreement. In addition, we have already noted the extensive evidence of testamentary device present in this case.

In Rudolph v. United States, 71 AFTR 2d 93-2169, 93-1 USTC par. 60,130 (S.D. Ind. 1993), a buy-sell agreement which required a corporation to purchase the decedent's shares at death for $1,000 per share was held to control the value for estate tax purposes.

However, the facts in <u>Rudolph</u> are distinguishable.  First, the
agreement at issue in <u>Rudolph</u> provided for review of the stock
purchase price at the annual stockholders meeting.  In addition, the
District Court found that there was no intent to escape the payment
of estate taxes; there was no evidence in the record with respect to
any discussion of the tax consequences that would result from the
buy-sell agreement.  <u>Id.</u> at 93-2179, 93-1 USTC at 88,452.[27]

Finally, petitioners argue on brief that if decedent's purpose
in entering into the Buy-Sell Agreement was testamentary, he would
not have agreed to restrict his right to make gifts of his shares to
family members.  Petitioners contend that decedent could have
achieved significant estate tax savings by making annual gifts
during the 15 years after the Buy-Sell Agreement was executed until
his death in 1990.  Petitioners' argument misses the mark, as they
fail to recognize that continuous gifts over such a sustained period
would have ultimately deprived decedent of his controlling interest
in CamVic.  This would have been unacceptable to decedent, whom
petitioners describe on brief as "a controlling person in his

---

[27]Petitioners' reliance on several other cases is similarly
misplaced.  In <u>Wilson v. Bowers</u>, 57 F.2d 682 (2d Cir. 1932), the
Court of Appeals for the Second Circuit did not even address the
issue of testamentary device.  In <u>May v. McGowan</u>, 194 F.2d 396,
397 (2d Cir. 1952), the Court of Appeals for the Second Circuit
stated that "here the district court found that there was no
purpose to evade taxes."  In <u>Bensel v. Commissioner</u>, 36 B.T.A.
246 (1937), affd. 100 F.2d 639 (3d Cir. 1938), the Board of Tax
Appeals found that the option was not a substitute for
testamentary disposition or a device for avoiding tax.  The Board
also found that the final price per share had resulted from
genuine arm's-length negotiations.

business and in his personal life." We hold that decedent had a testamentary purpose in entering into both the 1975 and 1981 agreements.

Petitioners argue that the existence of a testamentary intent should not be determinative if the price in the Buy-Sell Agreement represented the fair market value on the date the agreement was executed, citing Estate of Lauder v. Commissioner, T.C. Memo. 1992-736, and Estate of Bischoff v. Commissioner, 69 T.C. 32 (1977). Respondent argues that cases such as Estate of Lauder and Estate of Bischoff involved formula prices that accounted for variations in future value and are distinguishable from fixed price agreements. We need not decide this point, because we find that petitioners have not proven that $11,333.30 was the fair market value for a share of CamVic in either 1975 or 1981.

Where shareholders are members of the same family and the circumstances indicate that testamentary considerations influenced the decision to enter into a restrictive stock agreement, an assumption that the price stated in the agreement is a fair one is unwarranted. It is then incumbent upon the estate to demonstrate that the agreement establishes a fair price for the subject stock. Estate of Gloeckner v. Commissioner, T.C. Memo. 1996-148; Estate of Lauder v. Commissioner, supra. Such is petitioners' burden in the instant case.

Both parties presented expert evidence regarding the value of CamVic on the respective 1975 and 1981 dates of the two agreements.

Although expert opinions can assist the Court in evaluating a claim, we are not bound by the opinion of any expert and may reach a decision based on our own analysis of all the evidence in the record. Helvering v. National Grocery Co., 304 U.S. 282, 295 (1938); International Multifoods Corp. v. Commissioner, 108 T.C. 25, 46-47 (1997). Questions of value are an inherently imprecise exercise. Messing v. Commissioner, 48 T.C. 502, 512 (1967); Estate of Lauder v. Commissioner, supra.

Petitioners rely upon the expert reports and testimony of Matthew G. Kimmel, a national director in the Chicago, Illinois, office of Arthur Andersen's Valuation Services Group. Mr. Kimmel is a licensed realtor in the State of Indiana and a certified general real estate appraiser in several States.

In the instant case, Mr. Kimmel relied upon the income and cost approaches in determining CamVic's fair market value in 1975 and 1981.[28] In his report which was introduced at trial, Mr. Kimmel

---

[28]There are three generally accepted methods of determining the value of stock: The market comparison approach, the income approach, and the cost approach. Fishman, "Valuation Termination and Methodology", in Financial Valuation: Businesses and Business Interests, par. 2.7 (Zukin ed. 1990). Under the market comparison approach, the value of a company's stock is determined by comparison to the stock of similar companies with publicly traded stock. Under the cost (or asset-based) approach, the value of stock is equal to the fair market value of the company's assets less the total amount of its liabilities. Finally, under the income approach, the value of stock is equal to the present value of a company's future income stream. See id. pars. 2.7-2.10; see also Morton v. Commissioner, T.C. Memo. 1997-166. With respect to the market approach, Mr. Kimmel's report stated that it was considered but not relied upon in the determination of

(continued...)

concluded that the fair market value of CamVic using the cost approach was $948,000 or $6,925 per share as of May 31, 1975, and $2,248,400 or $16,424 per share as of April 30, 1981.[29]  Applying the income approach and, in particular, the discounted debt-free cash-flow method, Mr. Kimmel concluded that CamVic's fair market value was $1,388,100 or $10,140 per share as of May 31, 1975, and $1,615,000 or $11,797 per share as of April 30, 1981.  In reconciling these differences, Mr. Kimmel, in his report, accorded a "majority of the weight" to the income approach and "minimal weight" to the cost approach.  In his report, Mr. Kimmel ultimately concluded that CamVic's fair market value was $1.3 million or $9,496 per share as of May 31, 1975, and $1.8 million or $13,148 per share as of April 30, 1981.

For the reasons set forth below, we find that neither petitioners nor their expert have demonstrated that the fixed price per share as set out in the Buy-Sell Agreement reflected adequate

----

[28](...continued) value.  In his report, Mr. Kimmel stated that no comparables were found which were reflective of the business in which CamVic and CamRon were engaged and two businesses were found comparable to Ferguson.

[29]The disagreement between the parties' experts with respect to value pursuant to the cost approach is due to their differences over the fair market value of the underlying corporate assets.  While there are relatively small differences over the amount of corporate liabilities, the differences with respect to corporate liabilities would have little impact on the value of the corporate stock.

and full consideration for the CamVic stock includable in decedent's estate.

First, we note that during his testimony, Mr. Kimmel himself corrected a number of errors in his report. For instance, Mr. Kimmel's report listed the value of the Lakeview apartments under the income approach--Mr. Kimmel's preferred approach--at $290,000 as of the time of the 1981 Revised Agreement. At trial, Mr. Kimmel testified that he received information subsequent to submission of his report which caused him to increase his income approach valuation of Lakeview to $340,000.[30] Mr. Kimmel's report also stated that the income approach value of Victory Tower as of April 30, 1981, was $825,000; however, at trial, Mr. Kimmel testified that he had relied upon "suspect" data in the original report and that he had changed his valuation under the income approach to $840,000, the valuation determined by respondent. Mr. Kimmel's report applied a liquidity discount in his cost approach valuation of CamVic and its subsidiaries CamRon and Ferguson for both 1975 and 1981. Mr. Kimmel testified that this was erroneous, as the discount should have been applied at CamVic's level only. In his report, Mr. Kimmel valued CamVic using the cost approach at $6,925 per share in 1975 and $16,424 per share for 1981. At trial, Mr. Kimmel increased his valuations under the cost approach to $7,439 per share and $17,876 per share for 1975 and 1981, respectively. At the trial, Mr. Kimmel

---

[30]Mr. Kimmel's final estimate of value for this property was $325,000.

concluded that his corrections had no effect on his ultimate conclusion that the value of CamVic's stock in May 1975 and April 1981 was $1.3 million or $9,496 per share and $1.8 million or $13,148 per share, respectively.

Second, while Mr. Kimmel relied primarily upon the income approach in determining the value of CamVic's stock, he failed to provide an adequate explanation to justify his chosen expense estimates, which serve to reduce the valuation of a property under the income approach. When valuing Dina Terrace and Dina Tower, Mr. Kimmel estimated that expenses would be 55 and 47 percent of gross income for 1975 and 1981, respectively.[31] It is well established that estimates and assumptions not supported by independent evidence are of little assistance and will not be accepted as probative of value. See, e.g., Rose v. Commissioner, 88 T.C. 386, 418 (1987), affd. 868 F.2d 851 (6th Cir. 1989); Chiu v. Commissioner, 84 T.C. 722, 730 (1985).

Third, we note that Mr. Kimmel valued several properties below the value determined by Hamilton County, Ohio, for purposes of the county's property tax assessment. The parties have stipulated that Hamilton County computes the assessed value of real property by multiplying the county's estimate of market value by 35 percent. Using this formula, we have determined that Hamilton County

---

[31]In contrast, the computations regarding Dina Terrace and Dina Tower prepared by Mr. Hughes in 1975 show gross revenue of $360,217 and operating expenses of $144,087, indicating that expenses were only 40 percent of gross income. See supra p. 12.

estimated Dina Terrace and Dina Tower at a combined value of approximately $2,063,629 in 1975 and $2,721,971 in 1981. Mr. Kimmel valued these properties at $1.6 million and $2.5 million for 1975 and 1981, respectively. In addition, under the above formula, Hamilton County computed the value of the Lakeview apartments in 1981 at approximately $382,851, while Mr. Kimmel valued them at $300,000 for the same period. Thomas P. Dwyer, respondent's expert witness, stated in his report that "It has been my experience that properties in Hamilton County are valued conservatively. Generally, county values are less than the fair market value." Unlike Mr. Kimmel, Mr. Dwyer was quite familiar with the Hamilton County area. Hamilton County's valuations reinforce the conclusion that Mr. Kimmel undervalued properties in computing his valuation of CamVic.[32]

Finally, we note the variation between Mr. Kimmel's valuation and the valuations of CamVic's stock which occurred between 1971 and 1974. On June 21, 1971, CamVic merged with BRGC and Bommer Builders, Inc., and CamVic was the surviving corporation in the merger. The value of CamVic stock used to compute the exchange ratio for the merger was $14,192.45 per share. In addition, between 1972 and 1974, decedent made 12 gifts of CamVic stock to his children and grandchildren. Decedent valued each of these gifts at

---

[32]Mr. Dwyer also stated in his report that "Very few properties have county values higher than the actual market value. The few properties that are overvalued are normally appealed and subsequently revised." We note that CamVic successfully protested Victory Tower's 1981 value, and the county revised its assessed tax value from $300,940 to $280,000.

$15,105.74 per share for gift tax purposes.  The original Buy-Sell Agreement was entered into in May 1975 and set the price for CamVic stock at $11,333.30 per share.  Neither petitioners nor their expert gave any explanation for the approximately $4,000 (or greater than 25 percent) decline in the value of CamVic stock between 1974 and 1975.  Moreover, following our review of the record, we have also been unable to find any reason--outside of estate tax planning--to justify such a decline in value.

We conclude that petitioners have not met their burden of proving that the price per share set forth in the Buy-Sell Agreement or the Revised Agreement reflected adequate and full consideration for decedent's interest in CamVic stock.[33]  Estate of Gloeckner v. Commissioner, T.C. Memo. 1996-148; Estate of Lauder v. Commissioner, T.C. Memo. 1992-736.  Thus, we hold that the fixed price of $11,333.30 price per share set forth in both agreements is not binding for estate tax purposes.  As a result of our decision, further proceedings will be necessary to determine the actual fair market value of CamVic stock at the time of decedent's death on September 10, 1990.

Appropriate orders will

be issued.

_____

[33]Even petitioners' expert determined that the value of CamVic's stock exceeded $11,333.30 per share as of April 1981.